STEVEN F. GRUEL (SBN 213148)

315 Montgomery Street, 9th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net

www.gruellaw.com

Attorney for Defendant CHANTA HOPKINS


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR-16-0477 VC |
| | ) |
| Plaintiff, | ) |
| | ) DEFENDANT HOPKINS' NOTICE OF |
| v. | ) MOTIONS AND MOTIONS (1) FOR A |
| | ) *FRANKS* HEARING; (2) TO SUPPRESS |
| CHANTA HOPKINS, et al., | ) EVIDENCE SEIZED AT THE TIME OF |
| | ) ARREST; AND (3) TO SUPPRESS |
| Defendants. | ) EVIDENCE FOUND IN THE JASPER |
| | ) STREET APARTMENTS UNIT #3306 AND |
| | ) VEHICLE |
| | ) |
| | ) |
| | ) Date: November 28, 2017 |
| | ) Time: 10:30 am |
| | ) Honorable Vince Chhabria |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

*United States v. Chanta Hopkins et al.*

Page

NOTICE OF MOTION AND MOTION .................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................2

I. INTRODUCTION/SUMMARY OF ARGUMENT ................................................3

II. SUMMARY OF FACTS..............................................................................4

  A. The initial arrest of Chanta Hopkins ..........................................................4

  B.  The government did not acknowledge or produce Agent Carlson's search warrant affidavit until defense counsel specially requested it .................................................5

  C. Agent Carlson's Redacted Affidavit is Finally Disclosed Just A Few Weeks Ago.................6

  D. The fruits of the poisonous tree..................................................................7

III. THIS COURT SHOULD GRANT A HEARING PURSUANT TO *FRANKS V. DELAWARE* BECAUSE THE AFFIDAVIT PREPARED BY SPECIAL AGENT CARLSON REQUESTING THE USE OF A CELL SITE SIMULATOR (OR "STINGRAY") DEVICE CONTAINED MULTIPLE MATERIAL MISREPRESENTATIONS AND OMISSIONS...................................8

  A. Agent Carlson misrepresented that while in possession of Co-Defendant Artis' phone, Carlson observed multiple calls from a number he believed to be associated with Hopkins; Artis' cell phone records show there were no calls from that phone number at that time............9

  B. In describing the nature of the Cell Site Simulator device, Carlson omitted the many more invasive functions the device performs; at no point in the affidavit did Agent Carlson indicate that the device would be limited to obtaining location data .......................................11

C. Carlson misleadingly included in the warrant application a detailed reference to a previous illegal search of Hopkins' prior residence at 1389 Jefferson Street ............................................. 14

D. Given the manifest dishonesty of Agent Carlson's statement, it is impossible to construe it as anything other than intentional; moreover, the recklessness and intentionality of his misrepresentations are apparent when considering the shroud of secrecy surrounding the warrant applications .......................................................................................................................... 15

IV. CARLSON'S AFFIDAVIT LACKED PROBABLE CAUSE AND, THEREFORE, THE SUBSEQUENT SEARCH AND ARREST OF DEFENDANT HOPKINS WERE ILLEGAL ..... 16

A. The affidavit prepared by Agent Carlson lacked probable cause to believe that the target phone number belonged to Hopkins ........................................................................................ 16

B. In preparing his affidavit, Carlson relied on illegally obtained evidence that renders the request unconstitutional ................................................................................................. 19

C. The Alameda County Magistrate Judge who signed the warrant lacked the authority to allow Carlson to use the CSS device to search for Hopkins in San Francisco and by utilizing the CSS device to find Hopkins in San Francisco, the investigators exceeded the permissible scope of the warrant ......................................................................................................................... 19

D. By using the Cell Site Simulator to penetrate into Hopkins' apartment, the officers exceeded the scope of the warrant, and Agent Carlson did not supply probable cause sufficient to justify the intrusion into Hopkins' residence ....................................................................................... 21

E. The officers exceeded the authorized scope of the residential warrant and violated the express limitations of the judge indicating that all evidence is to remain under seal .............................. 22

V. DUE TO THE ILLEGALITY OF THE WARRANT REQUEST, THIS COURT SHOULD SUPPRESS THE ARREST OF CHANTA HOPKINS AS WELL AS ANY AND ALL EVIDENCE OBTAINED FROM THE SUBSEQUENT SEARCH OF HIS PERSON, HIS VEHICLE, AND THE RESIDENCE AT 45 LANSING STREET ................................................ 23

VI. CONCLUSION ................................................................................................ 25

# **TABLE OF AUTHORITIES**

*Franks v. Delaware.*,
    438 U.S. 154 (1978)..................................................................................................3, 8

*Illinois v. Gates*,
    462 U.S. 213 (1983)....................................................................................................17

*Jones v. United States*,
    2017 D.C. App. LEXIS 277 (D.C. App., Sept. 17, 2017).................................11, 12, 16, 17

*Kyllo v. United States*,
    533 U.S. 27 (2001)......................................................................................................21

*Silverman v. United States*,
    365 U.S. 505 (1961)....................................................................................................22

*United States v. Elliss*,
    2017 U.S. Dist. LEXIS 136217  (N.D. Cal. Aug. 24, 2017)....................................13, 21, 22

*United States v. Gourde*,
    440 F.3d 1065 (9th Cir. 2006) ...................................................................................17

*United States v. Jones*,
    565 U.S. 400 (2012)....................................................................................................22

*United States v. Karo*,
    468 U.S. 705 (1984)....................................................................................................21

*United States v. Kelley*,
    482 F.3d 1047 (9th Cir. 2007) ...................................................................................17

*United States v. Reeves*
    210 F.3d 1041 (9th Cir. 2000) .....................................................................................9

*United States v. Stanert*
    762 F.2d 775, as amended, 769 F.2d 1410 (9th Cir. 1985) .............................................9, 17

*Wong Sun v. United States*
    371 U.S. 471 (1963)....................................................................................................24

# STATUTES AND RULES

Federal Rule of Criminal Procedure
    Rule 41 ................................................................................................................ 20


Title 18, United States Code
    §3127(3) ...................................................................................................... 12, 13


California Penal Code
    § 830.1 ............................................................................................................... 21
    § 1529 ................................................................................................................ 21

STEVEN F. GRUEL (SBN 213148)

315 Montgomery Street, 9th Floor
San Francisco, California 94104
Telephone Number (415) 989-1253
Fax Number (415) 449-3622
attystevengruel@sbcglobal.net

www.gruellaw.com

Attorney for Defendant CHANTA HOPKINS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHANTA HOPKINS, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CR-16-0477 VC<br><br>DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE<br><br>Date: November 28, 2017<br>Time: 10:30 am<br>Honorable Vince Chhabria |

**TO:   BRIAN STRETCH, UNITED STATES ATTORNEY, AND TO SHAILIKA S.
         KOTIYA, ASSISTANT UNITED STATES ATTORNEY**

PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter

as the matter may be heard, in the courtroom of the Honorable Vince Chhabria, United States

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO
SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN
THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

1

1    District Judge, the defendant Chanta Hopkins, through his above-listed counsel, will move and

2    does hereby move this Honorable Court for entry of an order suppressing evidence improperly

3    obtained by the government.

4        This request is made pursuant to the Fourth and Fifth Amendments to the United States

5    Constitution; subsequent case law; the accompanying declarations and exhibits; the pleadings

6    and records on file in this matter; and upon such evidence and argument which may be presented

7    prior to and at the hearing on this motion.

8

9    Dated: October 11, 2017                    Respectfully Submitted,

10                                             /s/ *Steven F. Gruel*
                                              STEVEN GRUEL
11                                             Attorney for Defendant
                                              CHANTA HOPKINS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO
     SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN
     THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

# I.

## INTRODUCTION/SUMMARY OF ARGUMENT

On April 11, 2016, Chanta Hopkins (aka Askari Aqui Mohammed) was immediately arrested in the hallway as he left apartment #3306 of the Jasper Apartments located at 45 Lansing Street in San Francisco.  It was no accident that law enforcement waited in a vacant unit (#3301) across the hallway for Hopkins to leave. FBI Agent Stonie Carlson knew Hopkins was inside unit #3306 because four days earlier, he obtained an Alameda County Superior Court warrant authorizing the use of a cell site simulator device ("CSS"), also known as a "Stingray," to locate Hopkins. The agents activated the CSS at 10:21 a.m. on April 11, 2016. By 5:05 p.m. on April 11, 2016, Hopkins was arrested and the cell site simulator/Stingray device turned off.

A review of the Alameda County warrants, as well as the suspicious nature surrounding the late disclosure of these documents, suggests serious Constitutional violations, not only with respect to the location of Hopkins and the subsequent arrest, but the search of the apartment he was leaving at the time, which resulted in the seizure of the evidence at issue in this case. As described below, in preparing his affidavit for the initial warrant, Carlson made multiple intentional misrepresentations and omissions, thereby requiring this Court to order an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 171-172 (1978). Furthermore, notwithstanding Carlson's misrepresentations and omissions, the warrant application lacked probable cause to begin with. It suffered from other problems, as well, including the fact that it was improperly authorized by a state court judge and the search exceeded the permissible scope of the warrant.

For these reasons, Hopkins maintains that he was unlawfully arrested and the search of his person and his apartment were likewise illegal. This Court should, after reviewing the arguments, conclude that Agent Carlson lacked probable cause for the warrant and suppress the illegally seized evidence.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

3

## II.

## <u>SUMMARY OF FACTS</u>

### A.  <u>The initial arrest of Chanta Hopkins</u>

The salient facts begin in the early afternoon on April 5, 2016.  FBI agents Stonie Carlson and Brian Koh spotted Co-Defendant Donnell Artis standing outside Willie Brown's Liquor store located at 1933 Fruitvale Avenue, Oakland, CA.  The agents knew of Artis' outstanding arrest warrants and approached him. Artis fled and a chase ensued. *See* Declaration of Steven F. Gruel ("Gruel Dec."), ¶2, Exh. A.

While Artis managed to escape, Agent Carlson nonetheless recovered Artis' cellular telephone. Later that same day, at 3:29 p.m., federal agent Carlson obtained a California state search warrant to search Artis' cellular telephone; however, because of password protection, the contents of this cellular telephone were not extracted until April 8, 2016.

Meanwhile, two days later, on April 7, 2016, agent Carlson applied for and received another Alameda County state search warrant for a cell-site simulator to be used to locate Verizon Wireless assigned telephone number 832-763-5555. Agent Carlson wanted the Alameda County state search warrant to provide "real time tracking information, including but not limited to satellite Global Positioning System (GPS) . . ." Despite having turned over thousands of pages of documents in discovery, the government did not include agent Carlson's cell site simulator warrant, affidavit, or return. *See* Gruel Dec., ¶ 8, Exh. E.

It appears that it was only due to the deployment of the CSS device on April 11, 2016 from 10:21 a.m. to 5:05 p.m. that agent Carlson located Chanta Hopkins at an apartment complex in San Francisco located at 45 Lansing Street. Carlson made contact with the manager and other employees of the apartment complex and learned from them that Hopkins lived in apartment #3306. *See* Gruel Dec., ¶¶ 11-12, Exh. G.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

4

At approximately 5:00 p.m. on April 11, 2016, the officers arrested Hopkins immediately as he left the apartment because, at the same the same time, the arresting officers and agents were waiting across the hallway in apartment #3301. The officers deactivated the CSS device within five minutes of the arrest at 5:05 p.m., suggesting that the use of the device was instrumental in tracking Hopkins down. *See* Gruel Dec., ¶ 12.

Despite providing discovery consisting of thousands of documents along with numerous search warrants, photographs, and other evidence collected during the federal investigation, there was nothing in the government's discovery explaining how the agents tracked Hopkins down at the Jasper Apartments; however, in the subsequent warrant request, SFPD Sergeant Perez stated that, by interviewing employees at the apartment building, they were able to identify unit #3306 as being associated with Hopkins. The officers and agents then decided to wait directly across the hall in unit #3301 for Hopkins to emerge. Nothing in the government disclosures established the mechanism by which the officers and agents were able to locate the building where Hopkins was staying. The answer was not revealed until September 26, 2017 and only after numerous inquiries by defense counsel. *See* Gruel Dec., ¶¶ 7-9.

### B. The government did not acknowledge or produce Agent Carlson's search warrant affidavit until defense counsel specially requested it.

Subsequent to his April 11, 2016 arrest, Hopkins received while he was in Placer County for outstanding warrants, four sheets of paper describing the CSS device Agent Carlson used to track Hopkins' cellular telephone. Conspicuously absent from these forms were agent Carlson's supporting affidavit and the return for the warrant. *See* Gruel Dec., ¶ 3, Exh. B.

On September 8, 2017, defense counsel wrote to the prosecutor summarizing the defense efforts to obtain the complete set of documents for the Alameda county search warrants for the CSS device for telephone number 832-763-5555. According to the AUSA's reply, none of the

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

state documents used by agent Carlson pertaining to the CSS device targeting 832-763-5555 were ever provided to the AUSA prosecuting the case. *See* Gruel Dec., ¶ 8, Exh. E.

### C.  **Agent Carlson's Redacted Affidavit is Finally Disclosed Just A Few Weeks Ago**

On September 26, 2017, the government first produced what appears to be a complete set of documents pertaining to the Alameda County state warrant for the cell site simulator for number 832-763-5555. The Return to the warrant states that on April 11, 2016, the CSS device was deployed beginning at approximately 10:21 a.m. and turned off at approximately 5:05 p.m., just after the arrest. It also indicates that all "data collected during this mission has been destroyed," thereby leaving behind no trail to establish exactly what data the agents and officers intercepted. *See* Gruel Dec., ¶ 8, Exh. E.

The Affidavit in support of the warrant request, prepared by federal agent Stonie Carlson is heavily redacted, including the only portions of the affidavit detailing the supposed basis for Carlson's belief that Hopkins was using the targeted phone number. In paragraph 10, however, Agent Carlson claimed that while he was in possession of Artis' cellular telephone, obtained during the April 5, 2016 chase, the phone "received several incoming calls from cellular telephone number 832-763-5555." *See* Gruel Dec., ¶ 8, Exh. E.

Call log records for Artis' phone produced by the government in discovery prove this statement to be blatantly false. No calls from 832-763-5555 came to Artis' cellular telephone in the early afternoon following the April 5, 2016 chase. *See* Gruel Dec., ¶¶ 5-6, Exh. C.

Among the many pages of discovery produced by the government, there are three pages of call logs for Artis' cellular telephone detailing the call history for April 5, 2016. The first page shows the "incoming" calls to Artis' phone. There was a single incoming call (call #10) from 18327635555 on April 5, 2016 at 2:51:05 a.m. (UTC + 0)[1], which is April 4, 2016 at 7:51 p.m.

---

[1] The phone records are presented using Coordinated Universal Time (UTC), which is seven hours ahead of Pacific Standard Time (PST). *See* Gruel Dec., ¶ 6.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

(PST). The second page is a record of "missed" calls to Artis' phone. The highlighted single missed call (Call # 5) from 18327635555 was missed on April 5, 2016 at 8:04:14 a.m. (UTC +0), or 1:04 a.m. (PST) on April 5, 2016. Finally, the third page pertains to "unknown" calls to the recovered cellular telephone. Again, a single highlighted call from 18327635555 on April 5, 2016 at 6:02 p.m. (UTC +0), which is 11:02 a.m. (PST). *See* Gruel Dec., ¶¶ 5-6, Exh. C.

Thus, all three calls between Artis' phone and the target number that Carlson alleged was associated with Hopkins were made or received well before the "early afternoon" chase of Donnell Artis that led to Carlson's seizure of his phone. This makes it is clear that agent Carlson materially misrepresented facts necessary to the probable cause determination.

Using the state court to obtain the warrant for the use of the CSS device appears to be unique to Hopkins's case. The defense review of discovery reveals that the government applied for warrants and used at least six other CSS devices to locate codefendants in this case, but, unlike the warrant request in Hopkins's case, all those requests were made to federal magistrates (either Chief Magistrate Judge Joseph C. Spero, Magistrate Judge Sallie Kim or Magistrate Judge Jacqueline Corley) after receiving approval from AUSA Jerome Mayer-Cantu. *See* Gruel Dec., ¶ 10.

**D.   The fruits of the poisonous tree**

As argued below, the location and arrest of Mr. Hopkins was illegal. It follows that any evidence from the search of Mr. Hopkins and apartment #3306 must be suppressed as a matter of law. In his affidavit for the first residential search warrant, affiant San Francisco PD Sergeant Salvador Perez, stated that he fully believed that Mr. Hopkins "will be located within apartment unit 3306" and that the U.S. Marshals are "ascertaining" whether Mr. Hopkins is currently inside that apartment. *See* Gruel Dec., ¶¶ 11-12, Exh. G. The discovery shows that Mr. Hopkins was arrested as he walked out of unit #3306 into the hallway by law enforcement waiting across the

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

hallway in a vacant apartment, prompting Perez to prepare an updated warrant request. *See* Gruel Dec., ¶ 12, Exh. H.

The state warrant was explicitly limited to identification documents, credit cards, debit cards, computers and other devices used to manufacture false identification and credit or debit cards. There was no indication or authorization to seize any property beyond that mentioned in the warrant. In a handwritten note, Judge Ethan P. Shuman restricted the warrant and order so that "All information obtained through execution of the warrant that is unrelated to the objective of the warrant shall be sealed and not subject to further review, use or disclosure without court order." *See* Gruel Dec., ¶ 12, Exh. H. In sum, as discussed below the state warrant did not authorize searching for and seizing any drugs from apartment #3306, but the government directly violated Judge Shuman's explicit hand written order and seized the drugs and charged Mr. Hopkins for drug offenses without obtaining a subsequent court order.

## III.

### THIS COURT SHOULD GRANT A HEARING PURSUANT TO *FRANKS V. DELAWARE* BECAUSE THE AFFIDAVIT PREPARED BY SPECIAL AGENT CARLSON REQUESTING THE USE OF A CELL SITE SIMULATOR (OR "STINGRAY") DEVICE CONTAINED MULTIPLE MATERIAL MISREPRESENTATIONS AND OMISSIONS.

In *Franks v. Delaware*, 438 U.S. 154, 171-172 (1978), the United States Supreme Court held that in instances in which a defendant makes a showing that factual misstatements made by an affiant in support of an application for a search warrant were made deliberately or with reckless disregard, the court should excise those false statements and determine whether, in their absence, the application establishes probable cause to justify the search. If not, the evidence obtained as a result of the search should be suppressed. Not only misstatements, but also deliberate or reckless omissions from the application of material facts are fatal to the warrant.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

8

*United States v. Stanert*, 762 F.2d 775, 781, as amended, 769 F.2d 1410 (9th Cir. 1985).  "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw."  *Id*.  "To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."  *Id*.

When a defendant makes a substantial preliminary showing that an affidavit (1) "contains intentionally or recklessly false statements or misleading omissions," and (2) "cannot support a finding of probable cause without the allegedly false information," he or she is entitled to a hearing to determine the nature and extent of the affidavit's deficiencies.  *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).

    A.   **Agent Carlson misrepresented that while in possession of Co-Defendant Artis' phone, Carlson observed multiple calls from a number he believed to be associated with Hopkins; Artis' cell phone records show there were no calls from that phone number at that time.**

Carlson's stated purpose in seeking the Stingray warrant was to locate Hopkins. In order to establish probable cause, Agent Carlson had to demonstrate that the targeted phone number belonged to Hopkins. The portion of the affidavit in which Carlson set forth the basis for his belief that the targeted number belonged Hopkins is redacted; however, the unredacted context suggests it was most likely provided by a confidential informant. *See* Gruel Dec., ¶ 8, Exh. E. It is unclear from the affidavit when the agents received this information or whether they had any indicia of reliability regarding the information or the informant's credibility.[2]

---

[2] Hopkins and his counsel have filed, contemporaneously with the present motion, a motion for a court order to disclose the identity of the informant, as well as to obtain an unredacted version of Carlson's affidavit in support of the warrant request. Hopkins cannot meaningfully present his arguments concerning the illegality of the warrant without access to the information Carlson included in his affidavit that supposedly established a nexus between Hopkins and the target phone number.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

Agent Carlson indicated in his affidavit that while he was in possession of Artis' cell phone, he observed "several incoming calls" from the target phone number. *See* Gruel Dec., ¶ 8, Exh. E at ¶10. The significance of this information is that Carlson used it to suggest that Hopkins was still in possession of and actively using the phone associated with the target number. This is important. Without this piece of information, Carlson had no way to establish probable cause that the use of a CSS device on that phone would help to locate Hopkins. In fact, as Carlson admitted, he did not see Hopkins' name appear on Artis' phone, he only claims to have seen the target phone number. Even if Carlson's statements were true—they're not—it would only mean that someone using that number tried to call Artis, not necessarily Hopkins.

The major problem with Carlson's use of this evidence is that there is no record of the phone having received the calls at that time. In fact, call log records from Artis' phone line belie Agent Carlson's claim that he observed incoming calls. Carlson recovered Artis' phone in the afternoon on April 5, 2016. The call history for that day reveals that the only missed call from the target phone number occurred at 8:04 a.m. UTC (or 1:04 a.m. PST)—well before the officers recovered Artis' phone. This means it was impossible for Carlson to have observed additional missed incoming calls from the target number. *See* Gruel Dec., ¶ 5, Exh. C.

Also, it's important to recognize that, as Carlson admitted, he and the other investigators were unable to access the data on Artis' phone because it was password protected. *See* Gruel Dec., ¶ 8, Exh. E at ¶ 11. It was not until April 8, 2016 that the investigators gained access to the contents of the phone, so any earlier entries in Artis' call history showing calls made to or received by the target number would not have been visible to Carlson on April 7, 2016, the day he prepared his affidavit. This supports the assertion that Carlson's claim to have seen incoming calls from the target number was an affirmative misrepresentation.

Stripped of this statement, the government cannot establish that the affidavit set forth probable cause. This was the sole corroboration for Carlson's belief (based on information likely

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

provided by a confidential informant) that the target phone belonged to Hopkins. And even then, it was flimsy because Carlson did not indicate that he saw Hopkins' name when the calls were supposedly coming in on Artis' phone; rather, he said only that there were "several incoming calls from cellular telephone number 832-763-5555." *See* Gruel Dec., ¶ 8, Exh. E. at ¶ 10. Furthermore, Carlson acknowledged that he was unable to obtain subscriber information for the target number.

Other than Carlson's claim that he saw incoming calls from the target phone number, there was nothing presented in the affidavit to establish a contemporaneous evidentiary nexus between the target phone number and Defendant Hopkins. Without that critical link, the warrant lacked probable cause, rendering the subsequent CSS search illegal.  This Court should grant a *Franks* hearing to determine the scope of the misrepresentation in the affidavit.

**B.   In describing the nature of the Cell Site Simulator device, Carlson omitted the many more invasive functions the device performs; at no point in the affidavit did Agent Carlson indicate that the device would be limited to obtaining location data.**

In his affidavit, Special Agent Carlson never accurately described the technology that the investigators intended to use. A cell-site simulator ("CSS"), commonly referred to as a Stingray device, functions by mimicking a cell tower so that the target device (and others in the vicinity) will connect to the CSS device as it would an ordinary cell tower. In *Jones v. United States*, 2017 D.C. App. LEXIS 277, *6 (D.C. App., Sept. 17, 2017), the D.C. Court of Appeals, summarized witness testimony about the tracking functionality of CSS devices as follows:

> Sergeant Perkins testified at the suppression hearing about "how [the cell-site simulator they used] works," "based on the information that's publicly available." He explained that his team engages the cell-site simulator by programming into it a unique identifier—an MIN or IMSI number—associated with the target phone. The simulator then begins "listening for [the target] phone," which, as part of its normal operation, is "constantly transmitting to and receiving from a tower." The

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

officers operating the cell-site simulator drive around and "as soon as [the simulator] comes across [the target phone's signal], it grabs it and it holds on to it." Once the cell-site simulator "grabs" the target phone, the simulator begins reporting "general location information and signal strength" that can be used to locate the target phone's exact location. Sergeant Perkins testified that once the cell-site simulator "grabs" the target phone, the target phone is prevented from communicating "with an actual . . . tower."

Further information about the cell-site simulator was provided by Ben Levitan, an expert on "cellular telephone networks and systems" called by the defense. According to Mr. Levitan, cell phones are "dumb devices" that "generally connect themselves to the strongest cell tower signal that they detect." Mr. Levitan explained that a cell-site simulator "act[s] as a portable cell tower," which, "when turned on or brought into an area, may appear to be a stronger signal and cause [a] phone[] to break its connection with the cell phone network and reattach itself to the newly found . . . simulator." Mr. Levitan testified that when the cellphone "attach[es]" itself to the cell-site simulator, it "identifies itself by phone number and various codes," including its IMSI number. Although Mr. Levitan had never used the type of cell-site simulator utilized by law enforcement, he testified that he had used similar devices working within the telecommunications industry and that the devices allow the user to determine the target phone's direction and distance relative to the simulator device. Moreover, because the cell-site simulator is not a true cell tower connected with the cellular network, any cellphone connected to the cell-site simulator will not be able to communicate with the network: "[Y]our call doesn't go through[,] period. Nothing happens."

*Jones*, *supra*, 2017 D.C. App. LEXIS 277 at *6-8. Because they masquerade as cell towers, CSS devices are capable of doing more than merely pinpointing the location of the target device, however. In a very recent Northern District of California case, Judge Hamilton distinguished CSS devices from pen register and trap and trace devices, noting that "Stingrays also have the capability of intercepting the content of communications, not just information about numbers dialed in or dialed out." *United States v. Eillis*, 2017 U.S. Dist. LEXIS 136217, *26 (N.D. Cal. Aug. 24, 2017).

In the present case, Agent Carlson misleadingly and incorrectly characterized the CSS *as* a pen register device, stating, "A cell-site simulator constitutes a 'pen register' device within the meaning of Title 18, United States Code, Section 3127(3) in that it is 'a device or process which

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

12

records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which wire or electronic communication is transmitted.'" *See* Gruel Dec., ¶ 8, Exh. E. Carlson omitted the remaining portion of the definition, however. The full text of *18 U.S.C. §3127(3)* very clearly states that devices which intercept the contents of private communications are *not pen registers*: "the term 'pen register; means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, *provided, however, that such information shall not include the contents of any communication. . .*" *18 U.S.C. §3127(3)*, emphasis added.

Carlson's statement is misleading because it fails to acknowledge the powerful and potentially highly intrusive nature of the CSS device, which allows investigators to monitor the contents of communications sent by the targeted device. The misrepresentation is all the more problematic because Agent Carlson submitted the warrant to a state magistrate judge, and the Stingray devices are not commonly used by local law enforcement agencies.[3] It is highly likely that the state magistrate would not have recognized that, in fact, CSS devices are not the equivalent of pen register or trap and trace devices.

Moreover, in preparing his affidavit, Carlson not only failed to alert the magistrate of the scope of the CSS device's monitoring ability, but, unlike the agents in *Ellis*, Agent Carlson intentionally refrained from including language limiting the device to the pen register function. The warrant he sought expressly authorized a broad use of the device without restriction: "YOU ARE THEREFORE COMMANDED TO SEARCH: and obtain information with the use of a

---

[3] In the wake of Hopkins' arrest, FBI agents presented six warrant applications for permission to utilize CSS devices to locate individuals identified as co-defendants in this case. The manner in which the agents went about obtaining those warrants throws into relief the shortcomings of Carlson's application in the Alameda Superior Court. Those six subsequent CSS warrants were presented to one of three *federal magistrates*, and, unlike the Hopkins warrant, they were *all approved beforehand* by AUSA Jerome Mayer-Cantu. *See* Gruel Dec., ¶ 10.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

cell-site simulator to receive information from use of the Subject Telephone(s) as tracking device(s) in order to obtain real-time tracking information, *including but not limited to* 'pen register,' satellite Global Positioning System (GPS) and/or latitude and longitude cellular tower data signals to be transmitted to the cell-site simulator from the following Subject Telephone(s), by the Inspectors with the U.S. Marshal's [*sic*] executing the warrant." *See* Gruel Dec., ¶ 8, Exh. E, emphasis added. On its face, the warrant authorizes the use of a CSS device without limitation or restriction. This means that the agents could, and likely did, intercept private communications made and received by the target phone.

Had the magistrate been made aware of the power inherent in the CSS device, then it is highly probable the magistrate would have imposed limitations upon its use. Agent Carlson's omission precluded the magistrate from fashioning any sort of prophylactic order to prevent unreasonable intrusion into Hopkins' privacy.

### C. Carlson misleadingly included in the warrant application a detailed reference to a previous illegal search of Hopkins' prior residence at 1389 Jefferson Street.

Another misrepresentation by Carlson also requires the striking of a portion of the affidavit. (Additionally, as detailed below, Hopkins maintains that it undermines the validity of the warrant in its entirety.) In Paragraph 2, Carlson describes a prior seizure of firearms as well as electronic machines used for credit card fraud from a residence purportedly associated with Hopkins. Carlson's presentation of the facts surrounding that incident gave the impression, however, that it was a legitimate search when, in actuality, it was an illegal, warrantless search.[4] Notably, this is the only reference to firearms in the warrant application and Carlson used it to create a sense that Hopkins was a threat to public safety. This portion of the affidavit must be

---

[4] AUSA Kotiya offered to stipulate that the government will not introduce at trial any of the evidence seized from the Jefferson Street address.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

removed. Once excised, the remaining portions of the affidavit do not establish probable cause for any criminal activity in Alameda because the outstanding warrants Carlson referred to were out of Placer County which is not only outside of Alameda County, it is outside of the Northern District of California. Other than this reference to an illegal search, there was no mention of any criminal activity that occurred in Alameda County for which there was probable cause.

**D.** **Given the manifest dishonesty of Agent Carlson's statement, it is impossible to construe it as anything other than intentional; moreover, the recklessness and intentionality of his misrepresentations are apparent when considering the shroud of secrecy surrounding the warrant applications.**

As noted above, a *Franks* hearing is warranted only where the omissions or misstatements are either deliberate or reckless. Although this often proves difficult to demonstrate, in the present case, it is quite simple. First, Agent Carlson indicated he observed calls coming in from the target phone number. As the phone records show, this is impossible. Artis' phone could not have displayed missed calls from the target number at that time. The only possible interpretation of the evidence is that Agent Carlson simply lied, which, of course, shows intentionality. Likewise, his failure to articulate the full scope of the CSS device functionality can be nothing other than intentional, especially because he affirmatively misrepresented it as a pen register.

There is also substantial circumstantial evidence to support the interpretation that Carlson's misstatements and omissions were intentional. First, he went to a state magistrate, rather than a federal one. The CSS technology is relatively new and seldom, if ever, employed by local law enforcement agencies. It is highly probable that a state magistrate, unlike his federal counterpart, would have no clue regarding the potential for abuse and overreaching associated with the use of the Stingray device.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

15

More tellingly is the deep secrecy surrounding the warrant applications. Carlson, after taking the unorthodox step of going to a state magistrate for the warrant, then requested that it be sealed. When Sergeant Perez of the San Francisco Police Department sought a warrant to search the residence, he acknowledged his reliance on Carlson's investigative work, but made no mention of the use of a Stingray or the prior warrant application.

The warrant for the CSS device was not included in the original discovery and, according to the AUSA assigned to the case, was not even in the government's possession. It seems that Agent Carlson withheld the warrant application from both the government and, by extension, the defense. This sort of secrecy suggests an awareness of the problems with the warrant.

## IV.

## CARLSON'S AFFIDAVIT LACKED PROBABLE CAUSE AND, THEREFORE, THE SUBSEQUENT SEARCH AND ARREST OF DEFENDANT HOPKINS WERE ILLEGAL.

### A. The affidavit prepared by Agent Carlson lacked probable cause to believe that the target phone number belonged to Hopkins.

Just about two months ago, in *United States v. Eillis*, 2017 U.S. Dist. LEXIS 136217 (N.D. Cal. Aug. 24, 2017), the Honorable Judge Hamilton issued a lengthy analysis of the *Fourth Amendment* implications associated with CSS or Stingray searches. Rejecting the Government's argument, Judge Hamilton concluded that an individual has a reasonable expectation of privacy related to the location data transmitted by his or her cell phone, and, therefore, the use of Stingray devices to obtain real time cell site location data is a "search" for *Fourth Amendment* purposes. *Id*. at *20. A legal CSS search requires a warrant supported by probable cause. *Id*; *see also Jones v. United States*, 2017 D.C. App. LEXIS 277, *19-20 (D.C. App. Sept. 21, 2017) ("The government's use of the cell-site simulator to locate Mr. Jones was therefore a search. The government did not obtain a warrant and has not argued that the search

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

16

'f[ell] within a specific exception to the warrant requirement,' and therefore the search was unlawful under the Fourth Amendment.")

"The standards for determining probable cause for a search were spelled out in *Illinois v. Gates*, 462 U.S. 213 (1983)." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007), cert. denied, 552 U.S. 1104 (2008), citing *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (*en banc*), cert. denied, 529 U.S. 1042 (2006). Whether or not there was probable cause supporting the issuance of a search warrant is determined by the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause means a "fair probability" that contraband or evidence is located in a particular place. *Gates*, 462 U.S. at 246; *Gourde*, 440 F.3d at 1069. "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question.'" *United States v. Kelley*, 482 F.3d at 1050, citing *Gourde*, 440 F.3d at 1069 (citing and quoting *Gates*, 462 U.S. at 230, 246). Normally, the issuing magistrate's determination "should be paid great deference." *Gates*, 462 U.S. at 236. This Court should review the issuance of a search warrant by a magistrate judge for clear error, to determine whether the magistrate had a "substantial basis for concluding that probable cause existed." *Id*. at 239 (internal quotation marks and alteration omitted). Review is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985), amended on other grounds, 769 F.2d 1410 (9th Cir. 1985).

In the present case, Agent Carlson obtained a warrant for the search. As discussed above, when augmented to accommodate for Carlson's reckless and intentional misrepresentations, the warrant clearly lacks probable cause. Additionally, even if those omissions and misrepresentations were left intact, the affidavit falls far short of establishing probable cause.

Considering the nature of the warrant request, the single most important fact that Agent Carlson needed to establish was a connection between Hopkins and the target phone number. Yet

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

there were no specific facts outlined in the affidavit that would serve that purpose. In the redacted portion of the affidavit, Carlson seemingly indicated that a confidential informant suggested that Hopkins used that number. *See* Gruel Dec., ¶ 8, Exh. E at ¶ 8.

To corroborate that piece of information, Carlson included in his affidavit a paragraph suggesting he personally saw incoming calls from that phone number on Co-Defendant Artis' phone while it was in Carlson's possession. For the reasons articulated above, it appears that Carlson fabricated that evidence; however, even if one accepts it as true, that piece of evidence would not establish Hopkins' use of the phone. Anyone could have called Artis at that time using that number. Perhaps multiple people used the phone or the confidential informant identified the wrong person as having that number. The mere fact that Carlson saw incoming calls from that number is irrelevant unless he could establish that the number was associated in Artis' phone to the name Chanta Hopkins or some other known alias.

Lastly, Carlson indicated that he ran a check on the phone number using a search engine reserved for law enforcement, but it was registered to "an unknown number." *See* Gruel Dec., ¶ 8, Exh. E at ¶ 12. There was, therefore, no direct link ever established between Hopkins and the target phone number. The only connection depends entirely upon the reliability of the confidential informant, whose reliability cannot be assessed unless and until the government reveals the redacted part of the warrant application.

In order to justify the issuance of the warrant, Carlson had to establish that the targeted phone number belonged to the targeted individual. Consider a warrant for a residence, for instance. There, the agent must establish probable cause to believe that the suspect actually resides at the apartment or house for which the warrant is sought. If the affidavit does not provide sufficient reliable evidence to establish that most important fact, the warrant request must be denied. Moreover, an individual's relationship to his or her cell phone is arguably both

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

more private and harder to establish. A confidential informant's uncorroborated statement that a person uses a certain phone number is not sufficient to ensure the accuracy of the warrant.

This is especially important in this case where the potential intrusion into the target's privacy is so great. As noted above, CSS devices are capable of intercepting and revealing more than just the location of an individual; they can intercept the subscriber information and even the content of user transmissions. In light of the power of this new technology, it is necessary to ensure that the device is directed at the correct target phone signal.

**B. In preparing his affidavit, Carlson relied on illegally obtained evidence that renders the request unconstitutional.**

Central to Carlson's statement of probable cause was his reference to a prior incident in 2015 in which Oakland Police Department officers allegedly confiscated guns and items related to credit card fraud from Hopkins' prior residence. According to Carlson, bail bondsmen found contraband at a residence where Hopkins lived, although Carlson did not say how he confirmed that Hopkins lived there or who else might have also been living in that apartment. The bail bondsmen then contacted Oakland PD, and officers came to the residence and confiscated the contraband; however, they did so without a warrant. The search was, therefore, illegal. Because the Carlson relied upon an illegal search in his effort to establish probable cause, the warrant for the CSS device was tainted by that illegality and must be suppressed.

**C. The Alameda County Magistrate Judge who signed the warrant lacked the authority to allow Carlson to use the CSS device to search for Hopkins in San Francisco and by utilizing the CSS device to find Hopkins in San Francisco, the investigators exceeded the permissible scope of the warrant.**

An Alameda County Magistrate Judge approved the issuance of the warrant in this case. The warrant application contemplated that the U.S. Marshals Service would execute the warrant; however, at no point in the warrant request did Agent Carlson indicate that the device would be

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

used outside of Alameda County. Indeed, the majority of the affidavit focuses on several incidents in which Hopkins was believed to have been seen *in Oakland, not San Francisco*. *See* Gruel Dec., ¶ 8, Exh. E at ¶¶ 4-6. Carlson even says this explicitly: "Based upon the outstanding warrants, as well as the aforementioned criminal acts conducted within the City of Oakland, it is believed, Chanta Hopkins is currently residing/staying in Alameda County." *See* Gruel Dec., ¶ 8, Exh. E.

The scope of the requested warrant was clearly limited to Oakland, CA. An Alameda County Magistrate lacks the authority to issue a warrant permitting federal investigators to conduct searches in other counties, especially when the application lacks any specific reference to another county. The warrant application focused exclusively upon Hopkins' presence and activity in Oakland. Even if authorized to do so, there is no way that the magistrate could have interpreted the warrant request to encompass an out of county search. The scope of the warrant request, on its face, was limited to Oakland and, therefore, it was facially invalid.

Additionally, under Rule 41of the Federal Rules of Criminal Procedure, Agent Carlson was required to seek the warrant from a federal magistrate. Subsection (b)(1) expressly limits the use of state magistrates to searches for people or items within the jurisdiction: "a magistrate judge with authority in the district—or if none is reasonably available, a judge of a state court of record in the district—has authority to issue a warrant to search for and seize a person or property *located within the district*." *Fed. R. Crim. Pro 41(b)(1)*, emphasis added. This is made especially problematic in the present case because the outstanding arrest warrants that formed the basis for the search warrant application were out of Roseville, CA, a city in Placer, CA. Not only is Roseville outside of Alameda County, but it is also outside of the Northern District of California. There was, therefore, no criminal activity described in the warrant application that occurred in Alameda County.

Moreover, the rule also requires a showing that no federal magistrate was available. This is impossible in the present case. There was no urgency with respect to the outstanding arrest warrants, which were for non-violent offenses. Furthermore, Carlson requested the warrant on

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

20

Thursday, April 7, 2016, but he did not activate the CSS device until several days later, on Monday, April 11, 2016. During that period of time, there is no reason that Carlson could not have appropriately sought approval for the search from a federal magistrate. Instead, Carlson's decision to go to an Alameda County magistrate for authorization for a broad search that extended beyond the borders of Alameda County appears to be a matter of illegal forum shopping.

Finally, the Alameda County Magistrate was also prevented from issuing the warrant under California law. *California Penal Code §830.1* provides a comprehensive definition of who qualifies as "peace officers" under California law, and there is no reference to federal agents among the categories listed. *California Penal Code §1529*, which provides the required contents for a valid search warrant clarifies that state search warrants should be issued only to "peace officers." Therefore, the state magistrate had no authority to issue the search warrant to a federal agent in these circumstances.

### D. By using the Cell Site Simulator to penetrate into Hopkins' apartment, the officers exceeded the scope of the warrant, and Agent Carlson did not supply probable cause sufficient to justify the intrusion into Hopkins' residence.

Also significant, in this case, is the fact that the investigators used the CSS device to locate Hopkins in his residence. In *Ellis*, Judge Hamilton briefly addressed whether the use of a CSS device to locate a phone inside an individual's residence would constitute an illegal intrusion on a private residence. Citing *United States v. Karo*, 468 U.S. 705 (1984) and *Kyllo v. United States*, 533 U.S. 27 (2001), Ellis asserted that, as in those cases, the use of technological means to monitor the activities inside a private residence is a search within the meaning of the *Fourth Amendment* and requires probable cause. He also likened it to a trespass, thereby implicating another dimension of privacy. The investigators' use of a CSS device, Ellis argued, caused signals to "penetrate the walls of constitutionally protected spaces." *Ellis*, *supra*, 2017 U.S. Dist. LEXIS at *8. If so, the act was comparable to unconstitutional searches described in

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

*Silverman v. United States*, 365 U.S. 505 (1961), in which the Court held that officers' placement of a "spike mic" attached to a heating duct in the suspect's residence, and *United States v. Jones*, 565 U.S. 400 (2012), in which the Court rejected as unconstitutional agents' use of a GPS device that they physically attached to the suspect's car.

The Government countered, saying that Ellis lacked standing to raise this argument because Ellis was in someone else's apartment at the time. *Ellis*, *supra*, 2017 U.S. Dist. LEXIS at *8. The Government cannot make the same argument here because they simultaneously contend that the location where agents apprehended Hopkins was his residence.

Ultimately, it was unnecessary for Judge Hamilton to resolve the issue; however, this analysis underscores the intrusive nature of the search at issue in the present case and reinforces the need for probable cause.

**E.** **The officers exceeded the authorized scope of the residential warrant and violated the express limitations of the judge indicating that all evidence is to remain under seal.**

After the officers located Hopkins at the Lansing Street residence, they sought a warrant to search the apartment. The evidence the officers sought to obtain, and for which the warrant authorized seizure, was limited to the following: ID cards and drivers' licenses not in Hopkins' name, other false identification, computers and other electronic devices, magnetic card readers/writers, card embossing machines, and other items related to the suspected debit and credit card fraud. *See* Gruel Dec., ¶ 12, Exh. H. There was no allowance for a broad search for narcotics.

When executing the warrant, the officers found the items related to the alleged credit card fraud in plain sight. Despite having already recovered the items targeted by the warrant, the officers proceeded to search the apartment in depth, including places that could not possibly be considered potential repositories for the sort of evidence for which the officers were ostensibly

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO
SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN
THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

looking. The officers seized narcotics from the freezer and a kitchen cabinet, areas very unlikely to contain items associated with credit card fraud. This demonstrates that the officers used the warrant as a justification for a boundless search in the hopes of uncovering some other form of contraband (i.e. drugs, guns, etc.). This is an example of impermissible overreaching beyond the scope of the warrant.

Additionally, the magistrate who signed the warrant authorizing the residential search included the following hand written addendum: "All information obtained through execution of the warrant that is unrelated to the objective of the warrant shall be sealed and not subject to further review, use or disclosure without court order." *See* Gruel Dec., ¶ 12, Exh. H. The seizure of the narcotics was, as discussed above, not contemplated within the scope of the items identified in the warrant request and was, therefore, "unrelated to the objective of the warrant." The magistrate's handwritten text precludes the use of the evidence without a court order. Therefore, because the seizure of the narcotics was outside the scope of the warrant and the use of the narcotics in this prosecution in the absence of a court order violates the terms of the warrant, this Court should, at a minimum, prohibit the government from introducing the drugs in this case.

## V.

### DUE TO THE ILLEGALITY OF THE WARRANT REQUEST, THIS COURT SHOULD SUPPRESS THE ARREST OF CHANTA HOPKINS AS WELL AS ANY AND ALL EVIDENCE OBTAINED FROM THE SUBSEQUENT SEARCH OF HIS PERSON, HIS VEHICLE, AND THE RESIDENCE AT 45 LANSING STREET.

After arresting Hopkins, the investigating officers applied for a warrant to search the apartment where Hopkins had been. In doing so, they relied upon his presence at the apartment to establish his connection to it. The investigators located Hopkins and the residence they associated with him through the illegal use of a CSS device without probable cause.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

23

The "fruit of the poisonous tree" doctrine, established in *Wong Sun v. United States*, 371 U.S. 471 (1963)—an axiom of search and seizure law—prevents the use of evidence seized as a result of an earlier illegal search or seizure. In the present case, the agents would not have found Hopkins or his residence without deploying the CSS device to track his phone signal. If this Court agrees with Hopkins that the Government lacked the probable cause necessary to justify the use of the CSS device, it must also conclude that all evidence obtained as a result of the agents' use of the device was tainted by that illegality.

In preparing the affidavit in support of the warrant request for the Lansing Street apartment, Sergeant Perez omitted any reference to the tactics employed by Agent Carlson to locate Hopkins. Perez vaguely stated, "On today's date, *investigative leads* indicated [Hopkins] was possibly in the area of Lansing and 1st Streets in San Francisco." *See* Gruel Dec., ¶ 12, Exh. H, emphasis added. This oblique reference to nondescript investigative leads failed to inform the magistrate of the true means by which Carlson located Hopkins.

Importantly, Perez very clearly identifies Carlson's investigation as the only source of information regarding Hopkins' whereabouts. Perez included in his affidavit that Carlson "met with and spoke to the property manager" at the apartment complex as well other employees who informed Carlson that Hopkins was "currently residing in unit #3306." *See* Gruel Dec., ¶ 12, Exh. H. The agents derived these additional pieces of information used to identify the specific apartment Hopkins where the agents believed Hopkins was residing directly from the illegal use of the CSS device. There is no other means by which the officers and agents could have uncovered this information and, consequently, it is impermissibly tainted by the prior illegal search. Therefore, because the search warrant obtained following the arrest of Hopkins were the product of the prior illegal search, all evidence seized as a result of the warrant and the search incident to arrest must be suppressed.

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

# VI.

## CONCLUSION

For the foregoing reasons, this Court should rule that the use of the Cell Site Simulator was illegal, as were the resulting arrest and subsequent searches, and, therefore, order the suppression of all tainted evidence.

Dated: October 11, 2017          Respectfully Submitted,

                                        /s/ *Steven F. Gruel*
                                        STEVEN GRUEL
                                        Attorney for Defendant
                                        CHANTA HOPKINS

DEFENDANT HOPKINS' NOTICE OF MOTIONS AND MOTIONS (1) FOR A *FRANKS* HEARING; (2) TO SUPPRESS EVIDENCE SEIZED AT THE TIME OF ARREST; AND (3) TO SUPPRESS EVIDENCE FOUND IN THE JASPER STREET APARTMENTS UNIT #3306 AND VEHICLE

25