Pages 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
UNITED STATES OF AMERICA,      )
                               )
             Plaintiff,        )
                               )
   VS.                         )        NO. CR 16-00477 VC
                               )
DONNELL ARTIS, THURMAN GAITHER )
III, ANTONIO OLIVER, STERLING  )
HOLMES, and CHANTA HOPKINS also)
known as Askari Aquil Mohammed,)
                               )
             Defendants.       )
_____)
```

San Francisco, California
Wednesday, November 29, 2017

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
                     BRIAN J. STRETCH
                     United States Attorney
                     450 Golden Gate Avenue
                     San Francisco, California  94102
              BY:  RANDALL W.C. LEONARD
                     ASSISTANT UNITED STATES ATTORNEY

For Defendant Donnell Artis:
                     LAW OFFICE OF JOHN J. JORDAN
                     601 Montgomery Street - Suite 850
                     San Francisco, California  94111
              BY:  JOHN J. JORDAN
                     ATTORNEY AT LAW

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Thurman Gaither III:
                          LAW OFFICE OF ALAN A. DRESSLER
                          601 Montgomery Street - Suite 850
                          San Francisco, California  94111
                    BY:   **ALAN A. DRESSLER**
                          **ATTORNEY AT LAW**

For Defendant Sterling Holmes:
                          BORO LAW FIRM
                          345 Franklin Street
                          San Francisco, California  94102
                    BY:   **ALBERT J. BORO JR.**
                          **ATTORNEY AT LAW**

For Antonio Oliver:
                          PETER L. ARIAN LAW OFFICES
                          407 San Anselmo Avenue - Suite 201
                          San Anselmo, California  94960
                    BY:   **PETER L. ARIAN**
                          **ATTORNEY AT LAW**

For Defendant Chanta Hopkins also known as Askari Aquil
Mohammed:
                          LAW OFFICES OF STEVEN F. GRUEL
                          315 Montgomery Street - 9th Floor
                          San Francisco, California  94104
                    BY:   **STEVEN F. GRUEL**
                          **ATTORNEY AT LAW**

                          LAW OFFICES OF JASON T. CAMPBELL
                          300 Montgomery Street - Suite 660
                          San Francisco, California  94104
                    BY:   **JASON T. CAMPBELL**
                          **ATTORNEY AT LAW**

<u>Wednesday - November 29, 2017</u>                    <u>10:06 a.m.</u>

<u>P R O C E E D I N G S</u>

---oOo---

**THE CLERK:**  Calling Case Number 16-cr-00477, U.S.A.
versus Donnell Artis, U.S.A. versus Thurman Gaither, U.S.A.
versus Sterling Holmes, U.S.A. versus Antonio Oliver, and
U.S.A. versus Chanta Hopkins.

Counsel, please state your appearances for the record.

**MR. LEONARD:**  Good morning, Your Honor.  Randy Leonard
for the United States.

**THE COURT:**  Good morning.

**MR. JORDAN:**  Good morning, Your Honor.  John Jordan on
behalf of my client Donnell Artis, who's present in court in
the Marshal's custody in the top row to the end.

**THE COURT:**  Good morning, Mr. Artis.

**MR. ARIAN:**  Good morning, Your Honor.  Peter Arian on
behalf of Antonio Oliver.  He's present in court.  He's in
custody.  He's in the lower row on the end.

**THE COURT:**  Hello, Mr. Oliver.

**MR. DRESSLER:**  Good morning, Your Honor.  Alan
Dressler on behalf of Thurman Gaither.  Dena Young is out ill,
and I think the Court is aware of that.

**THE COURT:**  Yes.  Thank you.

**MR. GRUEL:**  Your Honor, good morning.  Steven Gruel on
behalf of Mr. Chanta Hopkins, who's in the back row on the

1  left.  Also with me is my colleague, who's assisted in this

2  case, Jason Campbell, Your Honor.

3          **THE COURT:**  Good morning.

4          **MR. CAMPBELL:**  Good morning, Your Honor.

5          **MR. BORO:**  And good morning, Your Honor.  Albert Boro

6  on behalf of Defendant Sterling Holmes.  Mr. Holmes is out of

7  custody.  He should be here but he's not here yet, Your Honor.

8          **THE COURT:**  Okay.  Do you want to waive his appearance

9  for these proceedings?

10         **MR. BORO:**  I do, Your Honor.

11         **THE COURT:**  Any objection from the Government?

12         **MR. LEONARD:**  No objection.

13         **THE COURT:**  Okay.  That's fine.

14         **MR. BORO:**  Thank you.

15         **THE COURT:**  I guess maybe let's start by talking about

16  Mr. Artis' motion to suppress, and let me start with the

17  Government.

18      I mean, I think the Government has some problems in this

19  case, continues to have some problems in this case.  How many

20  illegal searches were there in this case?  I mean, there was at

21  least one illegal search; right?  And that was the search of

22  Mr. Artis' girlfriend's apartment.  It seems like you don't --

23  you don't dispute that that was an illegal search.

24         **MR. LEONARD:**  Actually, Your Honor, I do.

25         **THE COURT:**  Why didn't you argue that the search was

1    legal in your papers?

2         MR. LEONARD:  The reason why I didn't rely on it is

3    because I cannot be clear because the agents cannot

4    specifically recall whether they saw an uneven stack of credit

5    cards before or after they had been moved.

6         THE COURT:  But they shouldn't have entered that

7    apartment in the first place.

8         MR. LEONARD:  I disagree, Your Honor.  They had an

9    arrest warrant.

10        THE COURT:  What's your authority for the proposition

11   that they could enter the apartment?

12        MR. LEONARD:  With an arrest warrant for Mr. Artis and

13   a belief that he is there --

14        THE COURT:  Do you have any authority?

15        MR. LEONARD:  That's *Payton* -- *Payton*, *Steagald*,

16   *Underwood*.  These cases stand for the proposition that if you

17   have an arrest warrant for somebody and you have a reason to

18   believe that they're in a location, that arrest warrant alone

19   is enough to go into that residence to execute the arrest

20   warrant.

21        So I have no problem with them going into that apartment

22   to execute the arrest warrant.  So we don't -- I don't even

23   think we need to talk about protective sweep or security sweep

24   or the door cracking open.  They had an arrest warrant for

25   Mr. Artis and a reason to believe that he was there, a belief

1  that was, frankly, by seeing the credit cards there was

2  substantiated.

3      I mean, so --

4      **THE COURT:**  So if you have a warrant to arrest

5  somebody but not a warrant to -- this is an issue that I've

6  not -- I mean, I just assumed you were -- frankly, I assumed

7  you were conceding that this search was illegal because nowhere

8  in the 50 briefs that you filed did you argue that the search

9  was legal.

10      **MR. LEONARD:**  I'm conceding, Your Honor, because I

11  cannot establish the plain view doctrine in that case with

12  respect to the cards because --

13      **THE COURT:**  Okay.  So you're saying if you have a

14  warrant to arrest somebody, that authorizes you to go into

15  their home and get them even if you don't have a warrant to

16  search their home?

17      **MR. LEONARD:**  Absolutely.

18      **THE COURT:**  Okay.

19      **MR. LEONARD:**  If you have an arrest warrant and a

20  reason to believe that that person lives at that house or is

21  there at that house.  And it started with --

22      **THE COURT:**  Then why is the declaration -- why is the

23  agent -- was it Carlson?  Stonie Carlson; right?

24      **MR. LEONARD:**  That's right.

25      **THE COURT:**  Why does Stonie Carlson's affidavit and

1  declaration talk about how he went there and the door was

2  unlocked or open and he became worried about safety and so he

3  needed -- felt the need to do a protective sweep?

4      **MR. LEONARD:**  He wanted full disclosure, and that's --

5  as soon as he knocked on the door and felt the door cracked

6  open --

7      **THE COURT:**  I mean, why didn't he say, "I went in

8  there to look and see if Mr. Artis was there because I had a

9  warrant for his arrest"?

10     **MR. LEONARD:**  Well, that is why they went to the

11  apartment, and I think he does make that clear.  They went to

12  the apartment to execute the arrest warrant.  Then when they

13  knocked on the door, the door cracked open, he thought that was

14  very odd and his interest immediately changed.  His interest

15  changed to, "Well, this is a high-crime area.  I'm going after

16  a criminal suspect.  The door's cracked.  The door came open as

17  I knocked.  This is weird."  And so his posture immediately

18  changed into a security sweep.  That is not to say that it's

19  unlawful to go in there.

20     **THE COURT:**  Okay.  But you don't contend that somebody

21  can go into an apartment just because it's a high-crime area

22  and the door is partially open?

23     **MR. LEONARD:**  No.  I mean --

24     **THE COURT:**  You know that's not permitted.  You think

25  that the reason it was okay to go in the apartment was because

1    he had a warrant for Mr. Artis' arrest?

2             **MR. LEONARD:**  Yes.

3             **THE COURT:**  Okay.

4             **MR. LEONARD:**  I think that is the strongest basis, and

5    I'm confident on the law at that point.  And it's two prong:

6    You have an arrest warrant and a reason to believe that the

7    person is there.

8             **THE COURT:**  Okay.  And so -- I mean, we can get back

9    to that if we need to, but I'm not sure if we do because you

10   are not relying on any of the information gathered by the

11   officers during the search of that apartment to justify the

12   affidavit for the arrest that took place at -- was it Willie

13   Brown's? -- not the arrest, the warrant for the phone -- to

14   search the phone that was taken at -- was it Willie Brown's

15   liquor store?

16            **MR. LEONARD:**  Outside of Willie Brown's liquor store,

17   yes, Your Honor.

18            **THE COURT:**  Okay.

19            **MR. LEONARD:**  I just want to be clear, though,

20   Your Honor.  I am -- you're right, I am not relying on that,

21   but I'm not doing it -- I'm not not relying on it because it

22   was an unlawful search.  I don't believe it was.  I'm not

23   relying on it because I can't establish through my

24   interviews -- through the declarations and my interviews with

25   the agents that they knew precisely that the cards were stacked

1    unevenly such that they were in plain view before or after or

2    if someone had manipulated them.

3            THE COURT:  Okay.  What about the August 20th, 2015,

4    warrantless search of the apartment on Jefferson Street in

5    Oakland?  Was that an illegal search?

6            MR. LEONARD:  I don't -- I don't know, but I do know

7    this --

8            THE COURT:  There's a stipulation.

9            MR. LEONARD:  That's right.

10           THE COURT:  The Government has stipulated --

11           MR. LEONARD:  Yes.

12           THE COURT:  -- to not using evidence from that search.

13           MR. LEONARD:  Yes.  I just don't want to say --

14           THE COURT:  I assume that was an illegal search.  I

15   assume the Government would not have stipulated to that if the

16   Government truly believed it was a legal search.

17           MR. LEONARD:  Fair enough, Your Honor.  I mean, that

18   is our approach.

19           THE COURT:  Okay.

20           MR. LEONARD:  I just don't want to say that I --

21           THE COURT:  Who conducted that search?

22           MR. LEONARD:  I'm sorry?

23           THE COURT:  Who conducted that search?  Did

24   Stonie Carlson conduct that search as well?

25           MR. LEONARD:  No, Your Honor.

1            **THE COURT:**  Who conducted that search?

2            **MR. LEONARD:**  That search was initiated by a bail

3    bondsman who then called Oakland PD and Oakland police officers

4    did that search.

5            **THE COURT:**  Okay.

6        Okay.  Now, turning to the search of the cell phone, let

7    me start -- I mean, I think there are -- you have two potential

8    problems.  One is that -- one is this issue of the federal

9    agent getting a warrant from the state court judge, the state

10    magistrate.  And I don't think that you have adequately

11    addressed that issue in your papers because you point to

12    federal law authority for a federal agent to serve as a state

13    peace officer and perform the functions of a state peace

14    officer; and that's fine, but what you don't point to is any

15    state law authority for the state court judge to issue a

16    warrant to a federal officer as existed in South Dakota in that

17    South Dakota case.

18        I wouldn't be surprised if there were California -- if the

19    law in California permitted state court judges to issue

20    warrants to federal officers who are part of some sort of joint

21    task force, joint law enforcement task force.  That wouldn't

22    surprise me, but you haven't pointed to it.

23        So do you have -- and I assume that if there is no state

24    law authority for a state court judge to issue a warrant to a

25    federal officer, then it was a bad warrant.  So do you have

1  any -- can you point me to any source of state law making clear

2  that a state court judge in California has authority to issue a

3  warrant to a federal officer?

4      MR. LEONARD:  Not anything other than I've already

5  presented in the papers, and that is the state law that

6  authorizes a state judge to issue a search warrant to a sheriff

7  and the --

8      THE COURT:  Yeah.

9      MR. LEONARD:  -- the Marshal's authority to --

10     THE COURT:  Well, where -- what's the definition -- I

11 mean, what's the state law definition of a "sheriff"?

12     MR. LEONARD:  That, I don't -- in California, I don't

13 know.

14     THE COURT:  Then why is that helpful?  I don't

15 understand why it's helpful that there -- to you -- that there

16 is a state statute that authorizes state court judges to issue

17 warrants to sheriffs.

18     MR. LEONARD:  I think it's because that Carlson, as

19 part of this joint State-Federal Fugitive Task Force, takes the

20 position as a sheriff for purposes of getting this warrant.

21     THE COURT:  Right, but doesn't there need to be some

22 source of California law saying that Carlson is deemed a

23 sheriff under California law?

24     MR. LEONARD:  I don't.  I think federal law and his

25 position as part of the State Fugitive Task Force --

1        **THE COURT:**  Federal law makes him a sheriff under

2   California law?

3        **MR. LEONARD:**  Well, I mean --

4        **THE COURT:**  So if federal law said that all French

5   poodles are sheriffs under California law, would that be okay?

6        **MR. LEONARD:**  Of course not, Your Honor.

7        **THE COURT:**  There would have to be California law

8   saying, "Yes, we agree that French poodles are sheriffs";

9   right?

10        **MR. LEONARD:**  Certainly.

11        **THE COURT:**  Otherwise French poodles would not be a

12   sheriff under California law; right?

13        **MR. LEONARD:**  That's right.

14        **THE COURT:**  So it seems to me that a federal law that

15   authorizes a federal officer to serve as a quasi state sheriff

16   is sufficient insofar as it goes to establish that when the

17   federal officer is doing that, the federal officer is not

18   violating federal law, but it does not establish that the

19   federal officer is authorized under state law to serve as a

20   peace officer.

21        Like I said, I wouldn't be surprised if there were some

22   California law out there authorizing a federal officer to serve

23   as a California peace officer, but I think unless you can show

24   me that, it must be a bad warrant.

25        **MR. LEONARD:**  I'm sorry?

1     **THE COURT:**  I don't understand how it would not be a

2  bad warrant if you could not establish that under California

3  law, Stonie Carlson was authorized to act as a peace officer.

4     **MR. LEONARD:**  Well, I just also add, Your Honor, that

5  in the warrant affidavits, Agent Carlson does specify that he

6  is assisting state law enforcement officers and he is a part of

7  this team that does include --

8     **THE COURT:**  Yes, but if a French poodle submitted an

9  affidavit to a state court judge saying, "I'm part of a

10  State-Federal Law Enforcement Task Force assisting state

11  officers," and the state court judge issued the French poodle a

12  warrant, that would be a bad warrant; right?

13     **MR. LEONARD:**  Certainly.

14     **THE COURT:**  Okay.  And the way -- unless there was a

15  state law that said French poodles can be peace officers under

16  California law; right?

17     **MR. LEONARD:**  That's right.

18     **THE COURT:**  Okay.  So why does it matter that

19  Stonie Carlson said in his affidavit that he was assisting

20  state officers?

21     **MR. LEONARD:**  Well, I think if -- with that language,

22  it demonstrates to the magistrate that he is a part of this

23  state team, which presumably includes state officers are on the

24  team.  He's just the person standing up there delivering the

25  affidavit, but there are state officers on this team.  So he's

1    just one representative of this state and federal team of which

2    there are a number of state peace officers that would qualify.

3           **THE COURT:**  But it sort of begs the question.  I mean,

4    let me ask you:  Have you had a chance to review carefully to

5    see if there is some source of California law authorizing

6    somebody like Stonie Carlson to get warrants from -- deeming

7    somebody like Stonie Carlson to be a peace officer or

8    authorizing somebody like Stonie Carlson to get a warrant from

9    a state court judge?

10          **MR. LEONARD:**  No.  I mean, clearly not as deeply as I

11   should.  I -- so, no.

12          **THE COURT:**  It seems to me that you lose if you don't

13   have that.  I mean, explain to me why you don't lose if you

14   don't have that.  I just don't understand.  I mean, if this

15   agent was not authorized under California law to get a warrant

16   from a state court judge or, to put it another way, if the

17   state court judge was not authorized to issue the warrant to

18   Stonie Carlson, then that's the end of the matter; right?  Then

19   how would you not lose if that were the case?

20          **MR. LEONARD:**  If that were the case, Your Honor, I

21   would say that is a highly technical question a judge ought to

22   catch, not the affiant; right?  So that would be an application

23   of the good faith exception, because the agent went in good

24   faith and delivered the facts and sat there and waited while

25   the judge considered it, and then took the warrant and executed

1    it.

2         This is a tricky -- a question.  It's not one that the

3    affiant should know.  It's one that the judge should know.

4         **THE COURT:**  Well, first things first.  Let's figure

5    out the answer to the state law question.  I mean, what if

6    there were a provision out there that said nobody -- let's

7    just -- I'm making this up.  I haven't had a chance to research

8    this myself either so I'm making this up, but let's say there

9    was a statute, a California statute, which said a state judge

10   may not issue a warrant to anybody except actual members of a

11   state or local Police Department, actual employees of a state

12   or local Police Department.  If there were a statute that said

13   that, then clearly the state court judge was not authorized to

14   issue the warrant to Stonie Carlson and it would be a bad

15   warrant; right?  You're saying even in that scenario --

16        **MR. LEONARD:**  I don't think we can --

17        **THE COURT:**  -- the good faith exception would apply?

18        **MR. LEONARD:**  I don't think we can ever divorce the

19   analysis from the good faith exception if we're talking about a

20   scenario when agents are relying on the warrant itself.  I

21   mean, I think that's what the good faith exception was borne

22   out of, agents relying on a search warrant that turned out to

23   be insufficient or invalid.  So I think the analyses on that

24   question have to be together.

25        **THE COURT:**  Okay.  All right.  So this is -- so that's

1    one problem that we have.

2        Do you have any -- before we turn to whether there was

3    probable cause, assuming it's not a bad warrant, a bad warrant

4    in the sense that we've been discussing, do you --

5            **MR. JORDAN:**  If I might, Your Honor.

6            **THE COURT:**  Go ahead.

7            **MR. JORDAN:**  First, just briefly going back to the

8    very first point, I strongly disagree.  *Payton*, I believe, does

9    require a search warrant to go into a residence to arrest

10   somebody even if you have a probation warrant from a California

11   judge for a violation, otherwise *Payton* is completely

12   meaningless.  What's *Payton* stand for?

13           **THE COURT:**  I haven't read *Payton* in anticipation of

14   this hearing, so you'll have to remind me what *Payton* says.

15           **MR. JORDAN:**  Well, Your Honor, *Payton*, a New York

16   case, involved police officers looking for a defendant -- I was

17   in New York at the time, and the word was they were coming from

18   a softball game and they decided to go to Mr. *Payton*'s

19   residence -- or grandmother's residence perhaps -- to see if he

20   was there without a search warrant to go into the house.  And

21   the Supreme Court said, no, houses are important.  A residence

22   is the most important protection under the Constitution.

23   Without a search warrant to go into the house, the arrest is

24   invalid.

25       I mean, I thought I briefed it.  There was no real

1  response from the Government making this argument that arrest

2  warrant alone is -- so if you want, I can give you some further

3  clarification.

4       **THE COURT:**  Yeah.  I'm a little surprised to hear that

5  if you have, you know, an arrest warrant for somebody but not a

6  search warrant, you can go into their house to arrest them; but

7  I -- that's not an issue I looked at in anticipation of this

8  hearing because I thought the Government was conceding that it

9  was a bad search.

10      **MR. JORDAN:**  Exactly, Your Honor.  If Your Honor does

11  have questions, I'd be happy to submit further authority on

12  that.

13      Going to the second point, the point you just raised, I

14  believe there is a California statute that tells a judge who he

15  can give a search warrant to.  It's in my papers.  California

16  has a statutory scheme under Penal Code 1529 at 830.1.

17      **THE COURT:**  Wait.  Hold on.

18              (Pause in proceedings.)

19      **THE COURT:**  Okay.

20      **MR. JORDAN:**  Those statutes define what a peace

21  officer is and also define what a judge -- how a judge can

22  issue a warrant.  It has to be to a California peace officer.

23      This question of --

24      **THE COURT:**  Well, but there -- I mean, I can imagine

25  in a number of places authority being created.  I mean, these

```
 1   task forces, for example -- right? -- there are lots of these
 2   task forces, these joint federal/state task forces --
 3        MR. JORDAN:  Absolutely.
 4        THE COURT:  -- and I assume there are documents, you
 5   know, like contractual documents or MOUs, or something like
 6   that, establishing these task forces; and I wouldn't be
 7   surprised if in these MOUs or other documents if it was
 8   provided that, you know, the federal members of the task force
 9   are considered peace officers for purposes of their task force
10   activities.
11        MR. JORDAN:  Well, first, this gets into, I think, an
12   important constitutional issue of state-versus-federal criminal
13   jurisdiction.  There is no federal police force.  Those
14   officers are limited under the commerce clause to what criminal
15   statutes they can enforce.
16        I would be --
17        THE COURT:  No, there --
18        MR. JORDAN:  There might be a large difference between
19   North Dakota and California.  California is extremely reluctant
20   these days to cooperate with federal authorities, for example,
21   on immigration issues.
22        THE COURT:  Yeah, but this isn't an immigration issue
23   and notwithstanding California's reluctance to cooperate on
24   immigration issues, there's tons of cooperation all the time
25   between state and federal law enforcement outside the context
```

1    of immigration.

2         MR. JORDAN:  That's true, but in my experience, in

3    that joint cooperation when warrants are sought, state officers

4    go to state judges for the state warrants and federal officers

5    go to the U.S. magistrate for the federal warrants.

6         I did research this.  I'm not going to say I read every

7    case in the country.  I could not find any case that upheld a

8    federal agent going in this circumstance to a state judge for a

9    state warrant.

10        As counsel said, the agent did say in his affidavit, "I'd

11   like this to be for any federal, state, or local officer," but

12   the warrant that was issued does not parrot that language.

13   That authority was not given by the judge.  That warrant, which

14   Your Honor has copies of, says "to any California peace

15   officer."  So clearly --

16        THE COURT:  Right.  And the question is whether

17   Agent Carlson was authorized to serve as -- was serving as a

18   California peace officer, you know, when he was doing this.  I

19   think if he wasn't, then I think the warrant has to be bad.

20        MR. JORDAN:  I agree, Your Honor.  I did look into the

21   issue as best I could.  I found no authority that would support

22   the Government's case.  If I had, I would have had to show it

23   to the Court and to the other side.  Eventually it would be

24   found, but I just didn't find it.

25        I'll rely on the case I cited in my surreply, the

1    District Court case that says that sheriff's statute, that

2    allows marshals to enforce federal law, not state law.  And the

3    warrant that was sought here was for state law violations.  It

4    was a California state warrant --

5            THE COURT:  Yeah.

6            MR. JORDAN:  -- for violation of state law.

7            THE COURT:  Yeah.  I'm not certain I agree with that.

8    I mean, I would think -- you know, there's this -- I can't

9    remember if you-all cited this or if my law clerk just found

10   it, but there is this Office of Legal Counsel opinion -- have

11   you seen that?

12           MR. JORDAN:  No, Your Honor, I haven't.

13           THE COURT:  -- from 1995, and it directly addresses

14   this question and it's 1995 Westlaw 944018, and it directly

15   addresses this question and says that -- interprets these

16   statutes as authorizing a federal officer who is serving as a

17   special deputy marshal, or whatever it's called for purposes of

18   these joint task forces, to arrest -- to -- let me see, let me

19   make sure I get it right here.

20                    (Pause in proceedings.)

21           THE COURT:  Yeah, to effectuate arrests of fugitives

22   for violations of state law.

23           MR. JORDAN:  I would have no problem with that,

24   Your Honor, but this is a search warrant.

25           THE COURT:  Well, I don't know how much of a stretch

it is to say that if they can effectuate an arrest of a
fugitive for violations of state law, why can't they
participate in the acquisition of a search warrant?

**MR. JORDAN:**  They could participate in the execution
of a search warrant, but I don't think the FBI agent can be the
affiant, can be the one applying for it.

**THE COURT:**  Why?

**MR. JORDAN:**  Because California law says --

**THE COURT:**  California law.

**MR. JORDAN:**  Yes.

**THE COURT:**  I thought you were bouncing back to
federal law and saying that the federal -- because the
District Court opinion that you were mentioning took the
position that as a matter of federal law, a federal officer
cannot do this because the federal officer is limited to
enforcing federal law.

And what I'm saying is I don't think that's right as a
matter of federal law.  I think probably as a matter of federal
law, a federal officer in Agent Carlson's position is
authorized to effectuate an arrest for violation of state law,
get a warrant for violation of state law; but it kind of begs
the question, I think, because I think that can only be true --
he can only do that -- I mean, he may be authorized under
federal law to do it, but he can only do it if state law
authorizes him to do it as well.

1   **MR. JORDAN:**  I understand, Your Honor.  I still draw a

2   distinction between authorized to participate and authorized to

3   be the affiant, but I'll leave it -- submit it on that point.

4   **THE COURT:**  Okay.  Why?  Why is the -- I know you want

5   to leave it at that point, but why does that distinction

6   matter --

7   **MR. JORDAN:**  Well --

8   **THE COURT:**  -- from a federal law standpoint?

9   **MR. JORDAN:**  Well, a law enforcement agent on the

10  street who has probable cause to seize somebody who's committed

11  a crime has authority under that statute to arrest him, but

12  that's much different from executing a search warrant where a

13  judge has to authorize it and you have to be the authorized --

14  you have to be an authorized person to do it.  To me that seems

15  to get into this federalist argument.

16  **THE COURT:**  The effect of these federal statutes is to

17  authorize these federal officers to serve as state law

18  enforcement officers --

19  **MR. JORDAN:**  See, I disagree.  I think that --

20  **THE COURT:**  -- authorizing them under federal law to

21  do that if it's okay with the state.

22  **MR. JORDAN:**  I guess, Your Honor, but -- and my point

23  is, of course, it's not okay with California in these

24  circumstances.

25  **THE COURT:**  I mean, I think that's the big problem

 1   here.

 2              MR. JORDAN:  Exactly.

 3              THE COURT:  Okay.  So that's one -- I think that's one

 4   problem we have and one kind of unanswered question that we

 5   have at this point.

 6         The next problem is Agent Carlson's affidavit.  I mean,

 7   let's look at the affidavit.  What do we have in the affidavit?

 8   We have the information about the Ellis Street search, which

 9   everybody agrees we should not consider.  So cross that out.

10         It seems to me the only two other things we have that

11   could potentially establish probable cause to search the phone

12   are, one, that Artis was a fugitive and he had outstanding

13   warrants; and, two, is this very cursory statement about

14   information received from a confidential informant with no

15   information explaining why we should believe what the

16   confidential informant says.

17         So on the first point, I mean, I guess there's some reason

18   to doubt at this point whether, in fact, there were outstanding

19   warrants for Mr. Artis; right?

20         I mean, in the affidavit Carlson said there were

21   outstanding warrants; Artis says that he does not think that

22   there were; and then in sort of a weird presentation that is

23   not -- you know, it's through lawyer argument but not actual

24   evidence, Artis says that at least two and maybe three of the

25   warrants were not outstanding anymore, that he pled guilty to

1    those offenses.

2        So, I mean, don't we have -- given the state of the

3    record, don't we at least have some fairly significant reason

4    to doubt whether there actually were outstanding warrants for

5    Artis at that point?

6        **MR. LEONARD:**  I don't know, Your Honor.  I'm not sure

7    what you're referring to when you say that those warrants

8    weren't outstanding anymore.

9        **THE COURT:**  Well, Artis says in his declaration that

10   he didn't believe he had any outstanding warrants, and Artis

11   says in his brief through his lawyer -- and it would have been

12   much better had they submitted actual evidence of this as

13   opposed to just lawyer argument -- but he says in his brief

14   that he had pled guilty to two of the three offenses that

15   Carlson claims there was an outstanding warrant for --

16       **MR. LEONARD:**  Okay.  Well, I assume --

17       **THE COURT:**  -- and that the third may have been

18   resolved, although they use some vague language about that in

19   their brief.

20       So, you know, don't we have -- it's already -- the

21   affidavit is already quite thin when you excise the

22   Ellis Street stuff, and then we have this reason to question

23   whether there really were outstanding warrants.

24       **MR. LEONARD:**  As you pointed out, Your Honor, I think

25   that's argument that counsel submitted.  So I don't know that

1   we can doubt on that record that there are outstanding -- that

2   there were not, excuse me, outstanding warrants.

3        I would add, too, that it's not just the outstanding

4   warrants.  It's the nature of at least one of the offenses;

5   right?  Because that ties to -- that ties to the suspected

6   criminal activity for this warrant.

7        So it's the outstanding warrants and it's the nature of

8   the offenses, and I think -- or at least one of the offenses,

9   and I think that's a critical piece as well.

10        **THE COURT:**  Okay.  If there were not outstanding

11   warrants in particular for the offense, what was the offense?

12   Was it identity theft?

13        **MR. LEONARD:**  One of the offenses was identity theft,

14   yes.

15        **THE COURT:**  Right.  If there were not outstanding

16   warrants, if that was wrong, clearly no probable cause; right?

17   Because all you'd be left with, then, was this very cursory

18   description of what a confidential informant said.

19        **MR. LEONARD:**  Yeah.  I think the outstanding warrants

20   are critical, yes.

21        **THE COURT:**  Okay.  So the outstanding warrants are

22   critical, and your position is that on this record there's no

23   basis to doubt that there were, in fact, outstanding warrants.

24        **MR. LEONARD:**  That's right, Your Honor.

25        **THE COURT:**  Okay.  So let me ask you:  Is there -- I

1   mean, why did this just come in the form of lawyer argument?

2   Why don't we have any evidence?  You have these assertions

3   about -- you attempt to cast doubt on whether there were

4   outstanding warrants, but why don't we have any evidence on

5   that, or do we have evidence that I missed?

6           **MR. JORDAN:**  That's exactly the problem here.  The

7   problem is, and it wasn't this Assistant U.S. Attorney, but I

8   have been asking the Government for these warrants and I

9   haven't received any.  I've called the Clerk's Office and they

10  say, yes, you know, these cases were resolved, but the

11  Government has to bring forth --

12          **THE COURT:**  Which Clerk's Office?

13          **MR. JORDAN:**  San Francisco Superior Court.

14          **THE COURT:**  Okay.

15          **MR. JORDAN:**  Apparently there was a probation matter;

16  but, again, I don't have the warrants.

17          **THE COURT:**  There was a what?

18          **MR. JORDAN:**  He was on probation, so there could be an

19  issue whether there was a probation warrant, but I have asked

20  for them.  And I understand --

21          **THE COURT:**  You mean a warrant on a probation

22  violation?

23          **MR. JORDAN:**  For a probation violation, which is

24  completely different than what's stated in the warrant, in the

25  search warrant.

1     **THE COURT:**  Right.

2     **MR. JORDAN:**  In the search warrant.

3     **THE COURT:**  Right.

4     **MR. JORDAN:**  So it's hard to not give you a warrant if

5  it doesn't exist.  I don't have it.  I have asked prior

6  counsel.  I understand she had a health issue and she left in

7  the middle of this, and the new assistant came in and we have

8  gotten some discovery, including a new search warrant for my

9  client, which we'll talk about in a bit, but I never received

10  copies of any warrants.

11     It's the Government who's relying on these warrants to

12  establish the probable cause in the search warrant.  I think

13  it's their responsibility to -- if Stonie --

14     **THE COURT:**  Carlson.

15     **MR. JORDAN:**  -- Carlson had these warrants, then he

16  should have them, and there should be no problem in producing

17  them.

18     **THE COURT:**  Well, I mean, all this makes me wonder if

19  we really do need a *Franks* hearing.  And, you know, it makes --

20  I mean, and one of the issues to explore at the *Franks* hearing

21  is what was your basis for believing that there were

22  outstanding warrants, you know; and, you know, perhaps also

23  what was your basis for believing that you had authority to get

24  a warrant in the first place to search the phone from a state

25  court judge.

1          **MR. JORDAN:**  That would be more of a *Franks/Leon*

2     hearing, I suppose, for that second point, but I agree.

3          **THE COURT:**  Yeah.  Yeah.  I think -- okay.

4          **MR. LEONARD:**  Your Honor, may I be heard on one last

5     point?

6          **THE COURT:**  Sure.

7          **MR. LEONARD:**  I think there is an overarching point

8     that we're overlooking here, and that is the defendants' status

9     as fugitives.  Now, for purposes of this argument, I'm going to

10    assume that, indeed, they were fugitives at the time.

11         **THE COURT:**  No, and I think you're right that -- I

12    think what I would say is that even if you take away the

13    Ellis Street -- the information from the Ellis Street search

14    and you look at the affidavit and you say, "Okay, there were

15    these outstanding warrants," and if Mr. Artis truly was a

16    fugitive at the time -- okay? -- then you say, "All right,

17    there are these outstanding warrants.  One of them was for

18    identity theft.  We have information from a confidential

19    informant that is very sketchy but is corroborated by the

20    outstanding warrant," and you have the fact that this fugitive

21    ran, then I think the totality of that is enough to establish

22    probable cause to search the phone, probably both for evidence

23    of identity theft and to figure out, you know, where the

24    fugitive is.

25         **MR. LEONARD:**  Where he is, right.

1    **THE COURT:**  So I think that's -- I tend to agree with

2   you about that, but I think the problem is that, you know,

3   everything from Agent Carlson is so sketchy.  I mean, I'm,

4   frankly, not sure, you know -- you know, I think we need to

5   hear from Agent Carlson on the warrants and on everything else.

6       And, you know, I don't know if -- I don't know if -- we

7   might also hear from him a little more -- maybe without

8   disclosing the identity of the confidential informant we might

9   hear from him a little more about why the confidential

10  informant was reliable or a little more information about the

11  confidential informant.  I'm not sure.

12      I guess what I would say about the confidential informant

13  is that if there were, in fact, outstanding warrants,

14  particularly for the identity theft, then I don't -- I think

15  that what is included in the affidavit about the statement from

16  the confidential informant, combined with the fact that there

17  were outstanding warrants and combined with the fact that Artis

18  ran, probably is enough.  And so there doesn't need to be any

19  further exploration of, you know, the confidential informant.

20  That's my tentative inclination.

21      But I think we probably need to hear from Agent Carlson.

22  I think we need to have a *Franks* hearing, and you're free to

23  ask him -- you know, explore the issue of good faith too.  I

24  mean, I'm sort of -- I will say that I'm skeptical that the

25  good faith exception could apply if this was a bad warrant, if

1  he was never authorized under California law to get this

2  warrant.  I'm skeptical of that but, you know, that's -- but I

3  haven't dived into that issue yet either.

4       **MR. LEONARD:**  Okay.  One last point, Your Honor.

5  Maybe this -- just before we commit to a *Franks* hearing, I

6  think we assumed a little too much about what is required in

7  terms of process, probable cause, in the pursuit of a fugitive.

8  And I think a case that the Ninth Circuit just decided two days

9  ago is illustrative on this point, and it's *United States*

10 *versus Johnson*.  I don't know if the Court had a chance to read

11 it.  I have copies here.

12      And it's about parolees, so I will start out of the gate

13 recognizing that parolees are probably in a different status

14 than a fugitive; but in *United States versus Johnson*, the panel

15 just two days ago said that parolees have a diminished

16 expectation of privacy like fugitives do, and that the police

17 officers in that case had no obligation whatsoever to seek a

18 search warrant to go inside that parolee's phone.  So *Riley*

19 *versus California* didn't apply because of the diminished

20 expectation of privacy; right?

21      So parolees/fugitives, maybe a little bit different, but I

22 think we all agree that the reasonable expectation of privacy

23 that a fugitive should expect like a parolee is diminished,

24 and --

25      **THE COURT:**  But why didn't you put in evidence that he

1    was a fugitive?  I mean, you know, they called that into

2    question in their papers.  Like, it seems like it probably

3    would have been really easy for you to put in evidence, actual

4    hard evidence, that he was a fugitive and that there were

5    outstanding warrants.

6         **MR. LEONARD:**  And that was my mistake, you're right,

7    Your Honor, and I accept responsibility for that.

8         **THE COURT:**  So let's hear from Agent Carlson on all of

9    that.

10        **MR. LEONARD:**  Okay.

11        **THE COURT:**  Now, if this was a bad warrant and if the

12   evidence from it needs to be excluded, does that sort of set

13   off -- does that set off a chain of dominoes that basically

14   makes all this -- like, resolves -- requires the exclusion of

15   all the other evidence that's been discussed in all the other

16   filings?

17        **MR. JORDAN:**  I would think so, Your Honor.  That would

18   be our position.

19        One thing would be whether a subsequent search was

20   attenuated by a different affidavit; and as I mentioned, I only

21   just got a new search warrant I think this week, which I thank

22   the Government for but I hadn't got it beforehand.  I haven't

23   really looked at it.  So they may have an argument for that

24   information, which I believe was tracker information about

25   Mr. Artis' whereabouts, that that might be attenuated if that

1  second warrant isn't tainted.

2     Without looking at the warrant closely, I can't really

3  tell Your Honor which way I would argue on that; but the other

4  evidence that directly flowed from going into the cell phone --

5  the pictures, the interviewing of the witnesses at the shooting

6  range, which they wouldn't know about if they didn't see the

7  photos -- all that would have to go, I would think.

8     **THE COURT:**  By the way, I mean, it does seem to me,

9  given the circumstances, that we need to do something to make

10  sure that everything that could conceivably be related to these

11  motions is turned over to the Defense before we proceed with

12  the *Franks* hearing, even if the disclosure is earlier than the

13  Government is accustomed to making it.

14     So, you know, I don't know how to deal with that other

15  than maybe to say that the Government is ordered to produce,

16  you know, all information that could conceivably be relevant to

17  these motions to the Defense before the *Franks* hearing.

18     **MR. JORDAN:**  So that, Your Honor, would basically go

19  to my motion to disclose the confidential informant and all the

20  other materials there in a separately filed motion.

21     **THE COURT:**  Yeah, except that I think -- like I said,

22  I think that if the -- if there -- you know, the one issue --

23  or one of the issues I agree with Mr. Leonard on is that if

24  there is -- if Mr. Artis was, in fact, a fugitive, particularly

25  for identity theft, then I don't think we need to look further

at the confidential informant because I think that the

information provided from the confidential informant in the

affidavit, though sparse, is fine because it's corroborated

basically.

     **MR. JORDAN:**  But that's a decision you won't make

until the *Franks* hearing, and so --

     **THE COURT:**  Right.

     **MR. JORDAN:**  -- I don't know if you want me to say

"Now I need the informant."  I prefer to have it ahead of time

and do one *Franks* hearing and be prepared for that.  That seems

to be the most efficient way.  I mean --

     **THE COURT:**  It certainly seems to be efficient, but

the default is that you don't -- you know, you don't turn

over -- you don't disclose the identity of the confidential

informant at this stage unless it really needs to be disclosed.

And if, you know, the *Franks* hearing sort of definitively

establishes that Mr. Artis was a fugitive, particularly on the

identity theft count, that probably is the end of the matter.

    So I don't know.  I would sort of defer to the Government.

I'm sure the Government -- sort of I assume -- I think I know

what you're going to say but, I mean, if the Government thinks

that it would be more appropriate to, you know, and more

efficient to proceed by just having a hearing on everything,

including the confidential informant, we can do that; or, you

know, the Government can attempt to, you know, establish the

1   validity of the warrant or the validity of the search first

2   before disclosing, you know, in an effort to avoid disclosing

3   the confidential informant.

4       **MR. LEONARD:**  Well, Your Honor, can I propose this?

5   Because, tell me if I'm wrong, it sounds like what the Court is

6   really interested in is confirmation that indeed Mr. Artis was

7   a fugitive.

8       **THE COURT:**  And confirmation that -- and I'm

9   interested in further exploring whether Carlson had authority

10   under California law to get this warrant from a state court

11   judge.

12       **MR. LEONARD:**  I'm just thinking the first, we could

13   get you with documentation; the second, I don't know that

14   Carlson is going to know the answer to.  I mean, it just seems

15   to me like a technical legal question.  He's probably going to

16   say "I'm part of this" -- I don't know what he's going to say,

17   but --

18       **THE COURT:**  I think there are enough irregularities

19   here and enough concerns about Agent Carlson's conduct that

20   there should be a *Franks* hearing and that they should be able

21   to explore these issues with him.

22     The only question that I have is whether we should allow

23   them to explore the confidential informant issue at the same

24   time or we should put that off and only do that if necessary.

25   So what's your view on that?

```
 1              MR. LEONARD:  As you predicted, I would ask that we
 2   not.
 3              THE COURT:  Okay.  That's fine.  That's fine.
 4        So when are we going -- so when should we have the Franks
 5   hearing?
 6              MR. LEONARD:  Well, with a lot of counsel and the
 7   holidays, I suspect we're going to have to figure out our
 8   schedules, Your Honor.
 9              MR. JORDAN:  I don't know, Your Honor.  Would you like
10   us to confer and come back and file something with the Court
11   and do that?  That might save some time here.
12              THE COURT:  Sure.  That would be fine.
13              MR. JORDAN:  You're thinking something after the new
14   year?  Perhaps January-February?
15              THE COURT:  I don't care.  What I want is -- I mean,
16   it could be December also, but what I want is the Government to
17   make absolutely sure that other than the identity of the
18   confidential informant, it has turned over everything to the
19   Defense that could be relevant to these motions.  And I want
20   the Government -- and I want to order the Government to do that
21   even if it entails turning things over that it usually does not
22   turn over until the eve of trial.
23        So is that clear?
24              MR. LEONARD:  It is perfectly clear, Your Honor.
25              THE COURT:  And I want to make sure the Government has
```

 1   time to be very thorough about that and make sure it's

 2   providing everything.

 3          **MR. LEONARD:**  And I think it would be appropriate for

 4   us to all meet and confer after this hearing to tie up any

 5   loose ends on that.

 6          **THE COURT:**  Okay.

 7          **MR. JORDAN:**  And I see Mr. Gruel to my left.  I know

 8   he's asked for --

 9          **MR. GRUEL:**  Stage left.

10          **MR. LEONARD:**  -- a *Franks* hearing also, so I bet he

11   wants to join in about that --

12          **MR. GRUEL:**  Your Honor --

13          **MR. JORDAN:**  -- if this is a good time for that.

14          **THE COURT:**  Sure.

15          **MR. GRUEL:**  Your Honor, I've been listening to the

16   Court's inquiries and listening to my colleagues -- or

17   colleague, and I concur essentially with everything that he

18   says.

19       I'm assuming, Your Honor, that when you talk about the

20   *Franks* hearing, you're including my client, Mr. Hopkins, in

21   that.  We asked -- we actually asked for that based on some

22   material misrepresentations, and I'm assuming that you're

23   granting that.

24          **THE COURT:**  I will tell you that I'm quite skeptical

25   of your argument, but since we're having a *Franks* hearing, if

1  you want to explore that, I'll allow you to explore it.

2            MR. GRUEL:  Perfect.  Thank you, Your Honor.

3       Your Honor was talking about the things that could be

4  disclosed sooner rather than later.  One of them I would make a

5  *Henthorn* request of Stonie Carlson, which is a request of his

6  personnel file for any previous times of any type of issues

7  with respect to his veracity; and, likewise, any Jencks

8  material that -- I don't know if he testified in the Grand Jury

9  in this case or testified in any other cases where his

10  credibility was called into question as an agent of the FBI or

11  the task force that we're talking about.

12            THE COURT:  Any objection?

13            MR. LEONARD:  I mean, he'll -- no.  No, Your Honor.

14            THE COURT:  Okay.  Granted.

15            MR. GRUEL:  All right.  Thank you, Your Honor.

16            THE COURT:  So that will be part of the discovery that

17  the Government turns over.

18            MR. JORDAN:  Your Honor, did you want -- I mean, we

19  can get back to you, perhaps, within 14 days with a proposed

20  schedule.

21            THE COURT:  Sure.  That sounds fine.

22            MR. LEONARD:  Okay.

23            MR. JORDAN:  That's good.

24            MR. LEONARD:  No objection from the Government.

25            THE COURT:  Okay.  So we'll do that.

1    Do you want to have a further status conference in 14 days

2 or do you want to just submit a stipulated schedule?  I don't

3 want to waste everybody's time coming in.

4    **MR. LEONARD:**  I'll be out of town.  I prefer to just

5 submit a stipulation.

6    **THE COURT:**  Okay.  That's fine.

7    **MR. JORDAN:**  That's fine, Your Honor.

8    **THE COURT:**  Is there anything else we should talk

9 about now, like severance, for example, or something?

10    **MR. JORDAN:**  Well, Your Honor, it seems everybody

11 agrees there should be a severance, so maybe Your Honor would

12 want to set with the -- I'm not sure the Government disagrees

13 with our proposal of two trials, though.  I'm unsure about

14 that.

15    **THE COURT:**  Yeah.  So my -- you know, I forgot my

16 notes.  I had written out three options, and let me see if I

17 can remember which option was my favorite.

18    **MR. JORDAN:**  Your Honor, can I just timeout, go back?

19    **THE COURT:**  Sure.

20    **MR. JORDAN:**  I forgot -- and I thank Mr. Dressler for

21 reminding me -- that one of the attorneys just had brain

22 surgery and is out for four weeks.

23    **THE COURT:**  Oh, yeah.

24    **MR. JORDAN:**  So maybe we'd have four weeks to get

25 something to you because she did have a serious operation.

1          **THE COURT:**  Yeah.  Is she -- but is she -- has she

2    come out of it okay?

3          **MR. JORDAN:**  Yeah.  Mr. Dressler says he talked to

4    her.  It was for an aneurysm.

5          **MR. DRESSLER:**  I did.  She's recovering and she can't

6    even drive for at least three or four weeks, but I expect maybe

7    five weeks out or six weeks out she'll be ready to roll.

8          **THE COURT:**  Well, give her my best, please.

9          And that's fine if you want to wait in light of that.  Of

10   course, if you want to wait four weeks to submit the

11   stipulation, that's fine.

12         You know, I suppose we could talk about the severance

13   issue later, but let me see if I can remember which was the

14   option that I thought, and I don't -- I think it was, again,

15   not something that anybody proposed, but I think it was -- let

16   me see if I can remember.

17         Who is the defendant who has the drug counts?  Is that

18   Mr. Hopkins?

19         **MR. JORDAN:**  Chanta Hopkins, Your Honor.

20         **MR. GRUEL:**  Mr. Hopkins.

21         **THE COURT:**  Okay.  I believe that the option that I

22   liked the best was to try -- to have a separate trial for

23   Mr. Hopkins on the drug counts and then to have a trial for all

24   the other defendants on everything else.

25         **MR. JORDAN:**  So I think --

1          **MR. GRUEL:**  I would object to that, Your Honor.

2          **MR. JORDAN:**   Mr. Gruel has the objection because of

3     the gun counts.

4          **MR. BORO:**   Your Honor, Mr. Holmes also would object to

5     that.  As we point out in our joinder on severance, there's no

6     factual connection between the gun count in one and the credit

7     card conspiracy.  So we believe it's highly prejudicial to lump

8     that in.  It's a different time period really.  It's a

9     different set of acts.  It has nothing to do with credit cards.

10         The only connection offered by the Government was the

11    Count 3 that charged the use of the false identity to rent the

12    guns, and Your Honor has now dismissed that count.  That was

13    against defendant Artis.  So we would request that the gun

14    count be tried separately.  It's a very short matter.  It's

15    probably a trial of a couple days.

16         **MR. GRUEL:**  And, frankly, Your Honor, the reasons why

17    co-defendants asked for severance from Mr. Hopkins and the drug

18    charges are identical to the reasons Mr. Hopkins would not want

19    to be in trial with the co-defendants on the gun charges.  It's

20    the prejudicial overspill that comes from that.  Guns and drugs

21    kind of carries negative inferences regardless of how the Court

22    tries to compartmentalize that.

23         So that's my objection to having Mr. -- Mr. Hopkins has no

24    problem being tried alone on his case.  It does not do him any

25    good to be tried separately on the drugs and then go with the

1  co-defendants on the credit card and the firearms.

2       MR. LEONARD:  The difference in the case of

3  Mr. Hopkins, Your Honor, is that he is charged in the

4  conspiracy for the credit card fraud and the drugs, the

5  evidence of which will overlap because of the search of his

6  apartment, which found evidence of both.  So it really serves

7  judicial economy to have those two tried together; and I think

8  the issues about spillover, about influence on the jury, are

9  issues that we see in countless cases, and you deal with those

10 with jury instructions.

11      So if the Court is inclined to do two trials, I think the

12 better proposal is to try the gun counts against those

13 defendants, and then the conspiracy and the drugs together,

14 because in particular the overlap of the evidence in those

15 latter two.

16      THE COURT:  Okay.  Well, I'm not going to make a

17 decision on that now.  We'll have an opportunity to discuss it

18 again.  Let's see what kind of trial, if any, we're having

19 after the --

20      MR. JORDAN:  The *Franks* hearing may be dispositive.

21      THE COURT:  So is there anything else that we ought to

22 be talking about right now?

23      MR. JORDAN:  Well, Your Honor, as long as you're not

24 setting a trial date, which I don't think you are, then we

25 don't have to talk about the deadlines for the discovery.  I

1    appreciate that the new assistant has gone through things and

2    given us new materials, so that's good, and so we'll keep

3    working with him.

4        There might be some more motions to be filed from the

5    defendants since we've gotten new discovery, but we can say

6    that in the statement we're going to give you.

7        The 404(b) can wait.  Discovery can wait.  The severance

8    you've talked about.  You've talked about the informant and the

9    motion to suppress.  So I think the only thing left is perhaps

10   Mr. Gruel's motion.

11           **MR. GRUEL:**  Right.

12       Your Honor --

13           **THE COURT:**  Which motion is that?  Sorry.

14           **MR. GRUEL:**  On behalf of Mr. Hopkins, we basically

15   brought the same type of motions that Mr. Donnell Artis brought

16   as well, and we asked specifically for a *Franks* hearing that

17   Your Honor is talking about.  So I don't need to belabor that.

18       But we also joined in and brought to the Court's attention

19   many of the facts that we've already talked about, and that is

20   Stonie Carlson, his veracity, his misrepresentations or his

21   problems, as we've referred to them.

22       But one thing I'll point out to Your Honor with respect to

23   Rule 41, which I saw in the second declaration -- Rule 41 being

24   that you have to use a federal magistrate for a search warrant

25   or federal judge -- it's clear in Stonie Carlson's second

declaration filed after the Defense had filed all these motions
that he was already working with the federal prosecutor I think
over in Oakland.  He makes reference to talking to --

        **THE COURT:**  You mean when he sought the state warrant?

        **MR. GRUEL:**  Yes.

        **THE COURT:**  When he sought the warrant from the state
court judge?

        **MR. GRUEL:**  In March of 2016, before any of these
search warrants were put into play, he says he talked with an
undisclosed AUSA about what had been found at Mr. Artis'
girlfriend's apartment.  That tells me, based on my experience
as a former prosecutor, as well as Mr. Jordan, that there's an
AUSA working on the case.

        **THE COURT:**  Maybe.  I mean, maybe he was pitching the
case to the U.S. Attorney's Office and they weren't interested
yet, and so there wasn't an active federal investigation and
that's why he got the state warrant.

        **MR. GRUEL:**  We'll find out in the *Franks* hearing, but
I think it's more nefarious than that, and that's why I
mentioned in my motions to suppress everything found because
this was the time they used some of the information found at
Mr. Artis'.

    I don't know if it's the same confidential informant.
There's at least two references to a confidential informant.  I
don't know if it's the same one, but they then used this

```
 1    information to go to an Alameda Superior Court judge to get

 2    this StingRay device what they believed to be on Mr. Hopkins'

 3    phone to try to locate him outside of Alameda in San Francisco.

 4         So we have a full -- another issue that has arisen and

 5    that is the scope -- in addition to everything Your Honor has

 6    talked about -- the scope of the state warrant that they got

 7    out of Alameda.  They used it indiscriminately over in

 8    San Francisco, a whole different county.  So it seems to me if

 9    they're going to be using a Superior Court judge in one county,

10    it's limited to the boundaries of over in the East Bay.  That's

11    another issue that we've raised with respect to scope.

12         We also raised in that issue, Your Honor, or in our own

13    motion, a very glaring omission by Mr. -- or a material --

14         THE COURT:  It sounds like you're just kind of

15    previewing the stuff that you want to be exploring in the

16    Franks hearing.

17         MR. GRUEL:  Yes.

18         THE COURT:  You're not asking for a ruling from me on

19    anything right now.

20         MR. GRUEL:  No.

21         THE COURT:  Okay.  That's fine.

22         MR. GRUEL:  Your Honor, we filed these motions.

23    There's numerous exhibits.  I just wanted the Court to be aware

24    that what's going to be presented at this Franks hearing is

25    going to be larger in scope than the concerns of Mr. Jordan.
```

1      We have also plenty of concerns with respect to the use of

2   the StingRay or the -- what is it called? -- the cell phone

3   simulator.

4          **THE COURT:**  Right.  And as I said to you, I'm fairly

5   skeptical of your argument.  I will allow you to explore it

6   but, you know, the case for a *Franks* hearing on that I think is

7   weaker and I'm not going to let you go on forever on that

8   during the *Franks* hearing.

9          **MR. GRUEL:**  But the same issues with respect to

10  probable cause exist, the scope of the warrant.  They actually

11  went inside his residence, or waited till -- they used the

12  simulator while it was in practice while he was inside his

13  residence, his home.  And so the things that you're talking

14  about, the privacy interests and the privacy interests in one's

15  home, is at play with respect to Mr. Hopkins.

16     They were using the simulator while he was inside his

17  apartment, essentially violating the Fourth Amendment as we

18  will argue and have argued and will show through the *Franks*

19  hearing as well.

20     So I just wanted Your Honor to know that we had these

21  issues.  We've presented them.  We hope to explore them at the

22  hearing.

23          **THE COURT:**  Okay.

24          **MR. LEONARD:**  Well, now I'm a little nervous about the

25  *Franks* hearing, Your Honor, because a *Franks* hearing --

1          **THE COURT:**  I am too.

2          **MR. LEONARD:**  -- is for the purpose of determining

3     whether or not the affiant made material -- and that's

4     critical -- material to the probable cause finding

5     misrepresentations or omissions so --

6          **THE COURT:**  I understand that.  It can be controlled

7     at the *Franks* hearing.

8          **MR. LEONARD:**  Thank you, Your Honor.

9          **MR. GRUEL:**  Well, I could be more specific than that,

10    and I can direct the Court and counsel to paragraph 10 where

11    Stonie Carlson said he had Artis' phone in his -- well, had

12    possession of it and that he was receiving incoming calls while

13    in possession.

14         **THE COURT:**  I'm familiar with the argument.  I have

15    looked at that.  I'm telling you I don't --

16         **MR. GRUEL:**  All right, Your Honor.

17         **THE COURT:**  -- it does not strike me as material, but

18    I'll allow to you explore it a bit with Agent Carlson since

19    he's already going to be here.

20         **MR. GRUEL:**  Very good.  Thank you, Your Honor.

21         **THE COURT:**  Okay.  Anything else?

22         **MR. JORDAN:**  I don't think so, Your Honor.

23         **MR. LEONARD:**  Not from the Government.

24         **THE COURT:**  Okay.  So we'll look forward to hearing

25    from you in a few weeks on how we're going to proceed.

1    **MR. JORDAN:**  Thank you, Your Honor.

2    **MR. LEONARD:**  Thank you, Your Honor.

3    **MR. GRUEL:**  Thank you, Your Honor.

4    **MR. BORO:**  Thank you, Your Honor.

5        (Proceedings adjourned at 11:07 a.m.)

6            ---oOo---

7

8

9            **CERTIFICATE OF REPORTER**

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:   Friday, December 8, 2017

14

15

16

17   _____

18        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

19

20

21

22

23

24

25